UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MODULAR DEVICES, INC.,

                                Plaintiff,

               -against-

BROOKHAVEN SCIENCE ASSOCIATES, LLC,
and AEi SYSTEMS LLC,

                           Defendants.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
CV 08-3267 (ARL)

**LINDSAY, Magistrate Judge:**

      Plaintiff Modular Devices, Inc. ("Plaintiff" or "MDI") commenced this action against

defendants Brookhaven Science Associates, LLC ("BSA") and AEi Systems LLC ("AEIS")

(collectively "Defendants") alleging misappropriation of trade secrets, breach of non-disclosure

agreements, tortious interference with contractual relations, unfair competition, unjust

enrichment, and trademark infringement under the Lanham Act, 15 U.S.C. § 1125.   BSA

asserted a counterclaim against MDI for breach of contract.   The parties have consented to the

undersigned's jurisdiction pursuant to 28 U.S.C. § 636.   Before the court are (i) Defendants'

motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56; (ii)

Plaintiff's cross motion for partial summary judgment pursuant to Rule 56; (iii) Plaintiff's cross

motion for summary judgment on BSA's counterclaim pursuant to Rule 56; and (iv) Plaintiff's

motion to strike the Reply Declaration of Ira S. Sacks.   For the reasons set forth below,

Defendants' motion is granted in part and denied in part, and Plaintiff's motions are denied.

## BACKGROUND

      The following facts are drawn from the parties' Local 56.1 Statements and are

uncontested except as otherwise noted.

**A.    Factual Background**

This matter arises from certain transactions entered into by the parties in connection with the construction of an experimental apparatus at the Large Hadron Collider ("LHC") at CERN (the European Organization for Nuclear Research) known as the ATLAS Detector to conduct high-energy physics research.

**1.    The Parties**

BSA is a not-for-profit limited liability company established for the sole purpose of managing and operating Brookhaven National Laboratories[1] ("BNL", and collectively with BSA, herein referenced as "Brookhaven" or the "Government") for the Department of Energy ("DOE").  (Pl.'s & Def.'s 56.1 Stmts. ¶ 1.)  Brookhaven serves as the United States host laboratory for forty-three institutions collaborating on the ATLAS Detector.  (*Id.* at ¶¶ 7-8.)   In connection with the construction of this apparatus, Brookhaven provides, *inter alia*, low voltage power supply ("LVPS") units to the Atlas Detector.  (*Id.* at ¶ 9.)

MDI is a New York corporation that designs and manufactures power supplies and power electronics for commercial, miliary and aerospace applications.  (*Id.* at ¶ 3.)   AEIS is a California limited liability company that conducts circuit and system reliability analyses and designs power supplies.  (*Id.* at ¶ 4.)

**2.    The Contracts Between BSA and MDI**

BSA and MDI entered into four contracts in connection with the development and/or

---

[1]BNL's objectives include, inter alia, the design, construction and operation of forefront facilities in science to meet the needs of the DOE and the international community.  (Id. at ¶ 2.)

production of LVPS units for use at the ATLAS Detector in the Large Hadron Collider at CERN, viz. (i) Contract 32365 (January 2000); (ii) Contract 44125 (November 2000); (iii) Contract 66116 (November 2002); and (iv) Contract 91308 (September 2004).[2]   (*Id.* at ¶¶ 10-37.)   Each of the four contracts incorporated a version[3] of Attachment A, "Brookhaven National Laboratories General Terms & Conditions for Non-Commercial Items" which states in pertinent part:

> Unless specified elsewhere in this Agreement, title to items furnished under this Agreement shall pass to the Government upon acceptance, regardless of when or where Brookhaven takes physical possession.  Unless this Agreement specifically provides otherwise, risk of loss or damage to the items furnished hereunder shall remain with the Seller until delivery of the items to the destination specified in the Agreement.

(*Id.* at ¶¶ 14, 27.)

During 2000, BSA entered into two contracts with MDI, to wit, Contracts 32365 and 44125 relating to the development of LVPS units, and under these contracts, MDI furnished Brookhaven with data, schematics, parts lists and modules between 2000 and 2002.   (*Id.* at ¶¶ 16- 21.)

On September 10, 2002, BSA made a Request for Quotation ("RFQ") for production of Radiation Tolerant Power Supplies.  (*Id.* at ¶ 23.)  MDI provided an itemized quotation, Q02/0239-3, for a crate power supply system on October 7, 2002.  (*Id.*)  On November 19, 2002,

---

[2]The phrase "Contract 66116 " is used interchangeably herein with the phrases "66116 Contract," "P.O. 66116" and "Purchase Order 66116" as are similar phrases referring to Contracts 32365, 44125, and 91308.

[3]Contract 66116 incorporated a different Attachment A than Contracts 32365 and 44125; however, paragraph 14 relating to passage of title is identical.  (*Compare id.*, Ex. 103 *with* Ex. 104.)

BSA placed Purchase Order 66116 with MDI to develop, *inter alia*, two prototype LVPS units. (*Id.* at ¶ 24.)  Purchase Order 66116 contained an option for Brookhaven to purchase two First Articles and 68 LVPS production units, and listed four line items descriptions, including (i) a non-recurring engineering ("NRE"); (ii) two prototypes; (iii) formal review; and (iv) a thermocouple test and incorporated Attachment A and Attachment B.  (*Id.*)   Attachment B, "Intellectual Property Provisions for a Contract with a Small Business or Nonprofit Corporation (Non-Educational) for Research, Demonstration or Development Work PSBNP-1287 (Facilities License)," provides in pertinent part:[4]

> 6.   RIGHTS IN DATA – GENERAL (JUN 1987)
>
> (a)   Definitions.
>
> "Limited rights data," as used in this clause, means data (other than computer software) developed at private expense that embody trade secrets or are commercial or financial and confidential or privileged.
>
> "Unlimited rights," as used in this clause means the right of the Government to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, in any manner and for any purpose, and to have or permit others to do so.
>
> *   *   *   *
>
> (b)   Allocation of rights.
>
> (1)   Except as provided in paragraph (c) below regarding copyright, the Government shall have unlimited rights in –

---

[4]Attachment B is also referred to as Appendix B.  MDI contends that the "PSBNP-1287" version of Attachment B which was attached to the Complaint and appended to Purchase Order 66116 by mistake, and that the  "PLB-1096" version of Attachment B to the RFQ was intended to apply.  As discussed *infra*, Purchase Order 66116 refers specifically to Attachment B "SBNP-1287."  *See infra* n. 11.

(i)     Data first produced in the performance of this contract

(ii)    Form, fit and function data delivered under this contract

(iii)   Data delivered under this contract (except for restricted computer software) that constitutes manuals or instructional and training material for installation, operation, or routine maintenance and repair items, components, or processes delivered or furnished for use under this contract; and

(iv)    All other data delivered under this contract unless provided otherwise for limited rights data . . .

*     *     *     *

(g)    Protection of limited rights data and restricted.

(1)    (i)     When data other than that listed in subparagraphs b(1)(i), (ii) and (iii) above are specified to be delivered under this contract and qualify as . . . limited rights data . . . . if the Contractor desires to continue protection of such data, the Contractor shall withhold such data and not furnish them to the Government under this Contract.  As a condition to this withholding, the Contractor shall identify the data being withheld and furnish form, fit and function data in lieu thereof.

(*Id.* at ¶¶ 28-29.)

Attachment B also contains a copyright provision which states:

Unless provided otherwise in subparagraph (d) below, the Contractor may establish, without prior approval of the Contracting Officer, claim to copyright subsisting in scientific and technical articles based on or containing data first produced in the performance of this contract and published in academic, technical or professional journals and symposia proceedings or similar works.  The prior, express written permission of the Contracting Officer is required to establish claim to copyright subsisting in all other data first produced in the performance of this contract.  When claim to copyright is made, the Contractor shall affix the applicable copyright notices of 17 U.S.C. 401 or 402 and acknowledgment of Government sponsorship (including contract number) to the data when such data are delivered to he Government, as well as when the data are published or deposited for registration as a published work in the U.S. Copyright Office.  For data other than computer software, the Contractor grants to the Government, and others acting on its behalf, a paid-up, nonexclusive, irrevocable world-wide

5

license in such copyrighted data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, by or on behalf of the Government.  For computer software, the Contractor grants to the Government and others acting on its behalf, a paid-up nonexclusive, irrevocable worldwide license in such copyrighted computer software to reproduce, prepare derivative works, and perform publicly and display publicly by or on behalf of the Government.

(*Id.* at ¶ 30.)

The production option contained in Purchase Order 66116 was exercisable through October 2003 and was extended by certain revisions providing that "[e]xcept as modified herein, all other terms and conditions remain unchanged."  (*Id.* at ¶ 31.)   In Revision 4 to Purchase Order 66116, dated April 7, 2004, Brookhaven exercised its production option for the two First Articles and 68 production units and added a clause which provided that:

The Buyer intends to make milestone payments against portions of the work in accordance with the milestone payment schedule, therefore, the following payment provisions apply.  All material and work covered by the progress payments shall become the sole property of the government of the United States, but this provision shall not be construed as relieving the contractor from full responsibility for all materials and work upon which payments have been made or the restoration of any work damaged prior to receipt and acceptance by Brookhaven or as a waiver of Brookhaven's right to require the fulfillment of all terms of this contract.  Furthermore, it is understood that these milestone payments are only tentative payments, and that upon any termination under this contract, shall be repaid at once, if and as requested by Brookhaven (subject to any other specific provisions of this contract regarding payments to the Contractor), in the event of termination title to any material and work covered by such repayments shall revert in the Contractor.

(*Id.* at ¶¶ 32-33.)

On September 16, 2004, Purchase Order 91308 was issued.  (*Id.* at ¶ 35.)  Revision 6 to Purchase Order 66116 was issued on September 20, 2004, and provided:

Change Order #6 deletes lines 5 and 6.  These Line Items will be transferred to Purchase Order 91308.  This is being done for accounting purposes to enable the

Option that was exercised to receive milestone payments.

(*Id.* at ¶ 36.)  Purchase Order 91308 states, "All Terms and Conditions and Milestone Payment

Schedule from P.O. 66116 apply to this order."  (*Id.*)

### 3.    The Non-Disclosure Agreements

There were two non-disclosure agreements ("NDA") between MDI and BSA.  The parties

entered into the first NDA on March 15, 2004, which was effective for one year (hereinafter

"NDA I").  (*Id.* at ¶ 64.)  Under NDA I, the parties recognized that it was "necessary to exchange

information, which embodies proprietary or restricted information, relating to items of MDI

manufacture or MDI intellectual property in the field of DC/DC converter products." (*Id.* at ¶

65.)  The parties agreed that "proprietary information" shall mean:

> (i)     Any written information originating from MDI related to the above mentioned
> field and marked as proprietary or restricted;
>
> (ii)    Any electronic version of such written information originating from MDI and
> marked as proprietary or restricted; and
>
> (iii)   Any oral information originating from MDI described at the time of disclosure as
> proprietary or restricted information and reduced to writing and delivered to the
> receiving party within 30 days.

(*Id.* at ¶ 66.)  NDA I provided that:

> All proprietary information disclosed by MDI to the other will be clearly
> identified as proprietary at the time of disclosure.  The receiving party agrees to
> use such information only in connection with the program or effort identified
> below, and only in support of MDI requirements.  The receiving party also agrees
> to avoid disclosure of such proprietary information to others except that in view of
> the purpose of this agreement, the receiving party may incorporate such
> proprietary information in a proposal or other report for submittal to a higher tier
> customer.  However, disclosure of such information to that customer shall be
> restricted by a restrictive legend on the proprietary information and the receiving
> party agrees to protect MDI's intellectual property rights to the maximum extent
> permitted by the receiving party's then prevailing policies as well as to the

maximum extent of any applicable government regulations.

(*Id.* at ¶ 67.)  The "effort" was identified as "Items Relating to MDI Intellectual Property,

Including, But Not Limited to MDI's Manufacturing, MDI's Designs, and MDI's Processes as

they pertain to the design and limited design rights for BNL Atlas power supply." (*Id.* at ¶ 68.)

NDA I further states that the agreement is not applicable to any information which:

without breach of this agreement by the receiving party, can be proven by the
receiving party to satisfy one or more of the following conditions:

a.      The proprietary information is or becomes specifically available to the public;

b.      It is obtained from a third party which has an unrestricted right to disclose the
information;

c.      It has been independently developed by the receiving party prior to the date of this
agreement

d.      Information which is not marked by the appropriate restrictive legend or marking;

e.      Information disclosed with the written approval of the disclosing party;

f.      Information disclosed by the Party providing the same to others on a non-
restricted basis.

(*Id.* at ¶ 69.)  NDI I expired on March 14, 2005. (*Id.* at ¶ 70.)

Between March 14, 2005 and November 15, 2005, the parties dispute whether there was a

NDA in place between MDI and BSA.  (*Id.*)  MDI maintains that the MDI Supplemental Terms

and Conditions contains a non-disclosure agreement that was in place during that time period.

(Pl.'s 56.1 Stmt. ¶ 70.)

As a result of a request by Brookhaven for the actual inductor/capacitor configuration at

the output of a power module, MDI requested that BSA enter into a second NDA on November

15, 2005, which had nearly identical terms as NDA I and which was effective for one year

8

(hereinafter "NDA II").  (Pl.'s & Def.'s 56.1 Stmts. ¶ 71.)   The "effort" in NDA II was identified

as "Items relating to MDI Intellectual Property, including, but not limited to, MDI's patent

pending radiation hardened DC/DC converter technology, MDI's manufacturing methods, MDI's

product designs and MDI's processes as they pertain to the design and limited design rights for

BNL ATLAS power supply."  (*Id.* at ¶ 72.)  NDA II expired on November 14, 2006.  (*Id.* at ¶

73.)   The parties dispute whether there was a NDA in place between MDI and BSA after

November 14, 2006.  (*Id.*)  MDI maintains that the MDI Supplemental Terms and Conditions

contains a non-disclosure agreement that was in place after November 14, 2006.  (Pl.'s 56.1

Stmt. ¶ 73.)   Both NDAs required protection of MDI proprietary information for three years after

the expiration of the NDA.  (Pl.'s & Def.'s 56.1 Stmts. ¶ 71.)

### 4.      Problems with the LVPS Units

In March 2005, MDI delivered the first of two First Articles to BSA, and shortly

thereafter production units started to be delivered to Brookhaven.  (*Id.* at ¶ 39.)  During the

testing of the initial production units, BSA identified certain units that did not function properly

and requested from MDI "Return Material Authorizations" ("RMAs") to permit these units to be

handled in accordance with MDI's warranty procedures.  (*Id.* at ¶ 40.)  Although the parties

dispute the reasons for the returns, between June and August 2005, Brookhaven continued to

request and received RMAs from MDI for certain of the production units.  (*Id.* at ¶ 41.)  In

December 2005 and January 2006, Brookhaven and MDI discussed and MDI implemented a

retrofit program to address the reported failures of the units.  (*Id.* at ¶ 42.)  Following the retrofit

program, BSA continued to return power supplies to MDI for repair and a failure analysis and

requested copies of  MDI's drawings, schematics, diagrams and parts lists to allegedly work with

MDI to remedy the  failures.  (*Id.* at ¶ 43.)  When the parties did not to work together, BSA hired

Ensil on December 1, 2006 to reverse engineer the LVPS units.  (*Id.* at ¶ 44.)  Ensil did the

reverse engineering and delivered a schematics to BSA.  (*Id.*)

On December 1, 2006, BSA hired AEIS to conduct a failure analysis, stress and derating

analysis and Worst Case Circuit Analysis on the LVPS units.  (*Id.* at ¶ 45.)  AEIS utilized

schematics from Ensil's reverse engineering, from a prototype and production unit control board,

and from Dr. Stefan Simion, a scientist from CERN.  (*Id.*)  During the course of its analysis,

AEIS contacted Payton America, Inc. ("Payton")[5] concerning information about the transformers

used in the LVPS units.  (*Id.* at ¶ 48.)  On January 26, 2007, AEIS requested information from

Payton regarding three planar transformers, 9557/01, 9576/01 and 9854 used by MDI in the

LVPS units delivered to BSA. (*Id.*)

On February 1, 2007, BSA hired Algen Design Services, Inc. ("Algen") to repair and

retrofit the LVPS units pursuant to BSA's Request for Proposal, entitled "Retrofit and Testing of

ATLAS LVPS" dated December 12, 2006 and Algen's proposal dated December 29, 2006.  (*Id.*

at ¶ 47.)  In response to a Request for Proposal dated February 27, 2007 for replacement power

supplies, BSA entered into two contracts to design and manufacture replacement power supplies

for the MDI LVPS units: one with Wiener, Plein & Baus, Ltd. ("Wiener") and one with AEIS

and Algen jointly.  (*Id.* at ¶ 50.)  By March 2007, all outstanding invoices to MDI for delivery of

LVPS units were paid in full.  (*Id.* at ¶ 51.)

Algen retrofitted the LVPS units of MDI, and then the units were installed in the ATLAS

---

[5]MDI had hired Payton to design and manufacture the transformers used in Contracts
44125, 66116 and 91308.  (*Id.*)

Detector, with the last of the retrofitted units having been installed in May 2009.  (*Id.* at ¶ 52.)
After such installation, no one has had access to the retrofitted units, and it is currently
anticipated that the ATLAS Detector will be closed until the end of this year.  (*Id.*)  According to
MDI, the MDI logo is visible on the power supply.  (Pl.'s 56.1 Stmt. ¶¶ 52-53.)

### 5.    BSA's Access to and Copies of MDI Schematics and Drawings

Throughout the course of the business relationship between BSA and MDI, Brookhaven
requested copies of, and/or access to, schematics and drawings from MDI.  (Pl.'s & Def.'s 56.1
Stmts. ¶ 58.)  The parties dispute whether the requested documents were produced, the dates
certain of the documents were produced, and the conditions under which certain of the
schematics and drawings were made.  (*Id.* ¶¶ 56-60.)  The factual background underlying the
parties' positions will be set forth in the relevant discussion section below.

### 6.    MDI's Alleged Trade Secrets

MDI asserts trade secrets in the design and manufacture of radiation-tolerant LVPS units,
including information relating to MDI's radiation hardened DC/DC converter technology, MDI's
manufacturing methods, MDI's product designs and processes as they apply to BSA LVPS units.
(Amended Compl. ¶¶ 65-66.)  The parties dispute the documents MDI alleges to constitute trade
secrets.  (Pl.'s & Def.'s 56.1 Stmts. ¶¶ 75-79.)  The factual background underlying the parties'
positions will be set forth in the relevant discussion section below.

## B.    Procedural History

On or about July 7, 2008, Plaintiff commenced an action against defendants in Supreme
Court of the State of New York, Nassau County, and on August 12, 2008 defendants filed a
notice of removal in the United States District Court for the Eastern District of New York.  In its

Amended Complaint, MDI alleges (i) misappropriation of trade secrets against Defendants; (ii) breach of the NDAs against defendant BSA; (iii) tortious interference with contractual relations against defendant AEIS; (iv) unjust enrichment against defendant AEIS; (v) common law unfair competition against defendant BSA; and (vi) federal trademark violations against defendant BSA.  In their respective Answers, Defendants raise affirmative defenses and BSA asserts a counterclaim against MDI for breach of contract.

Defendants now move for summary judgment pursuant to Rule 56.  Plaintiff cross moves for partial summary judgment of liability on its Second Cause of action, summary judgment on its Fifth and Sixth Causes of Action and moves to strike defendant BSA's Eighth Affirmative Defense pursuant to Rule 56.  In addition, Plaintiff  cross moves for summary judgment on defendant BSA's counterclaim, and/or in the alternative partial summary judgment on defendant BSA's counterclaim.  Finally, Plaintiff moves to strike the reply declaration of Ira S. Sacks from the record.

## DISCUSSION

## I.      Summary Judgment Standard

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In

determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion," *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)), or "where cross-motions for summary judgment are filed, against the party whose motion is under consideration," *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (internal quotation marks and citation omitted).  *See Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks and citation omitted) (holding that a court faced with cross motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but, "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration"); *see Luv N' Care, Ltd. v. Walgreen Co.,* 695 F. Supp. 2d 125, 130 (S.D.N.Y. 2010).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)).  The nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  *Matsushita*, 475 U.S. at 586.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  However, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## II.     Plaintiff's Motion to Strike the Reply Declaration of Ira S. Sacks

As a preliminary matter, MDI moves to strike the Reply Declaration of Ira S. Sacks (the

"Declaration") submitted in support of Defendants' summary judgment motion on the ground

that the Declaration contains impermissible legal arguments.  Defendants oppose the motion.[6]

"Whether to grant or deny a motion to strike is vested in the trial court's sound

discretion."  *Peters v. Molloy College of Rockville Centre*, No. CV 07-2553 (DRH) (ETB), 2010

WL 3170528, at *1 (E.D.N.Y. Aug. 10, 2010) (internal quotation marks and citations omitted).

When resolving a motion to strike, courts use "a scalpel, not a butcher knife."  *Pharmacy, Inc. v.*

*American Pharmaceutical Partners, Inc.*, No. 05-776 (DRH) (AKT), 2007 WL 2728898, at *1

(E.D.N.Y. Sept. 14, 2007) (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)

(internal quotation marks omitted)).  That is to say, "the court will strike only those portions that

are improper."  *Id.*  "When seeking to strike, the moving party bears a heavy burden, as courts

generally disfavor motions to strike."  *Peters*, 2010 WL 3170528, at *1 (internal quotation marks

and citations omitted).  Plaintiff asserts that the Declaration fails to comply with Rule 56(e) and

is an improper attempt by Defendants to circumvent the requirements of Local Civil Rule 7.1(a).

In response, Defendants maintain that the Declaration is a factual attorney declaration that merely

corrects  misstatements and mischaracterizations of the facts.

Rule 56(e) of the Federal Rules of Civil Procedure provides in pertinent part that, in the

context a motion for summary judgment, "[a] supporting or opposing affidavit must be made on

_____

[6]Plaintiff's application to file a reply in further support for its motion to strike the
Declaration is denied.

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e).  Thus, "[a] court . . . may

strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain

inadmissible hearsay or make generalized and conclusory statements."  *Hollander v. American*

*Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v.*

*Abramson*, 232 F.3d 83 (2d Cir. 2000)) (holding district court acted within its discretion when it

struck portions of an affidavit that contained legal arguments and "more resemble[d] an

adversarial memorandum than a *bona fide* affidavit").  "Alternatively, a court may, in

considering a motion for summary judgment, simply decline to consider those aspects of a

supporting affidavit that do not appear to be based on personal knowledge or are otherwise

inadmissible."  *Flaherty v. Filardi*, No. 03 Civ. 2167, 2007 WL 163112, at *4 (S.D.N.Y. Jan. 24,

2007) (internal quotation marks and citations omitted); *see Peters*, 2010 WL 3170528, at *1

(same); *see also Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003) ("To the

extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the

Court may strike those portions, or may simply disregard them").

Local Civil Rule 7.1(a) provides that

> [e]xcept as otherwise permitted by the court, all motions and all oppositions
> thereto shall be supported by a memorandum of law, setting forth the points and
> authorities relied upon in support of or in opposition to the motion, and divided,
> under appropriate headings, into as many parts as there are points to be
> determined.  Willful failure to comply with this rule may be deemed sufficient
> cause for the denial of a motion or for the granting of a motion by default.

Local Civil Rule 7.1(a).  Although Defendants properly set forth legal arguments in their reply

memorandum of law, defense counsel's reply Declaration improperly contains legal conclusions

which, apart from failing to comply with Rule 56(e), has the effect of exceeding the page limits for legal analysis provided under the Local Rules and the undersigned's individual rules. Defendants' submission of a declaration on reply for such purposes is inappropriate. *See Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 72 (E.D.N.Y. 2004) (finding that legal arguments set forth in a reply affidavit are improper and had "the effect of circumventing the Court's page limits on memoranda which is 10 pages for a reply memorandum"); *see Busler Enter., Inc. v. MG Refining and Marketing, Inc.*, No. 96 Civ. 3590 (LMM),1997 WL 672018, at *7 (S.D.N.Y. Oct. 29,1997) ("When opinions on ultimate facts and legal conclusions appear in an affidavit, courts will simply disregard the extraneous material"); *Larouche v. Webster*, 175 F.R.D. 452, 455 (S.D.N.Y. 1996)  ("When ultimate facts and legal conclusions appear in an affidavit, such extraneous material should . . . be disregarded by the court" ).  Thus, rather than parsing the Declaration to determine which portions to strike, the Court will disregard those portions of the Declaration that set forth legal conclusions, and will rely solely upon admissible evidence in its analysis of the summary judgment motions.  *See United States Alliance Federal Credit Union v. Cumis Ins. Society, Inc.,* No. 03 Civ. 10317 (PGG), 2009 WL 2914368, at *15 (S.D.N.Y. Sept. 11, 2009) (holding "[a] court is not required to conduct a line-by-line analysis of a challenged affidavit, however, and may simply disregard those portions that are inadmissible"); *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 566, 568 (E.D.N.Y. 1999) (stating that "rather than scrutinizing each line . . and discussing whether they contain conclusory allegations, legal arguments, or hearsay . . . the court . . . will only consider [] evidence that is admissible."). Accordingly, Plaintiff's motion to strike the entire Declaration is denied.

III.    **Defendants' Motion for Summary Judgment on Claims 1, 2, 3, 4, 5 and 6**
        **Plaintiff's Cross Motion for Summary Judgment on Claims 2, 5 and 6**

A.      **Misappropriation of Trade Secrets (Claim 1)**

In order to prevail on a claim for misappropriation of trade secrets under New York law,

"a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used

that trade secret in breach of an agreement, confidential relationship or duty, or as a result of

discovery by improper means."  *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110,

117 (2d Cir. 2009) (internal quotation marks and citation omitted).  "[A] trade secret is any

formula, pattern, device or compilation of information which is used in one's business, and

which gives [the owner] an opportunity to obtain an advantage over competitors who do not

know or use it."  *Softel, Inc. v. Dragon Med. & Scientific Communications, Inc.*, 118 F.3d 955,

968 (2d Cir. 1997) (internal quotation marks and citation omitted); *accord Ashland Mgmt. Inc. v.*

*Janien*, 82 N.Y.2d 395, 407 (1993).  New York courts have considered the following factors in

determining whether information qualifies as a trade secret:

> (1) the extent to which the information is known outside the business; (2) the
> extent to which it is known by employees and others involved in the business; (3)
> the extent of measures taken by the business to guard the secrecy of information;
> (4) the value of the information to the business and its competitors; (5) the amount
> of effort or money expended by the business in developing the information; (6)
> the ease of difficulty with which the information could be properly acquired or
> duplicated by others.

*North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (quoting *Ashland*

*Mgmt. Inc.*, 82 N.Y.2d at 407)); *accord Waterville Inv., Inc. v. Homeland Sec. Network, Inc.*, No.

08-CV-3433 (JFB) (WDW), 2010 WL 2695287, at *3 (E.D.N.Y. July 2, 2010).  "In most cases,

this is a highly fact specific inquiry."  *Scientific Componenets Corp. v. Sirenza Microdevices,*

17

*Inc.*, No. 03-CV-1851 (NGG) (RML), 2006 WL 2524187, at *23 (E.D.N.Y. Aug. 30, 2006) (internal quotation marks and citation omitted).

Plaintiff claims that Defendants misappropriated MDI's trade secrets contained in the design and manufacture of radiation-tolerant LVPSs, including information relating to MDI's radiation hardened DC/DC converter technology, MDI's manufacturing methods, MDI's product designs and processes, over the course of the performance of four contracts for goods and engineering and two nondisclosure agreements.  Defendants refute Plaintiff's claims contending that they did not misappropriate any trade secrets or proprietary information of MDI because pursuant to the contracts entered into by the parties, title to the items and information furnished under the contracts transferred to BSA upon acceptance and therefore MDI did not possess a trade secret to the information at issue.  Thus, under the first element of a misappropriation claim, the threshold inquiry is whether MDI possessed a trade secret in the items furnished to BSA under the parties' contracts.

### 1. The Contracts

The interpretation and construction of the contracts are governed by federal common law of government contracts.[7]  *See Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 n.4 (2d Cir. 1999) ("contracts with the government are governed by federal common law").  "[I]n developing federal common law in an area, [a court] may look to state law."  *American Home Assur. Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006); *see*

---

[7]In each of the four contracts between MDI and BSA relating to the development and/or production of the LVPS units, MDI agreed to be bound by the terms and conditions contained in a version of Attachment A.  (*Sacks Decl.,* dated April 23, 2010, Exs. 12, 14, 17, 22, 27-29, 30-35, 37, 57, 71, 72, 94.)  Pursuant to Attachment A, the interpretation and construction of the contracts are governed by federal common law of government contracts.  *Id*.

18

*E.E.O.C. v. Federal Express Corp.*, 268 F. Supp. 2d 192, 204 (E.D.N.Y. 2003).  "When it comes

to general rules of contract interpretation, there is little difference between federal common law

and New York law."  *Barnes v. American Int'l Life Assur. Co. of New York*, 681 F. Supp.2d 513,

520 (S.D.N.Y. 2010); *see Hapag Lloyd Container Linie, GmbH*, 446 F.3d at 316.  Where the

issue on summary judgment involves the construction of contractual language, "a court should

accord that language its plain meaning, giving due consideration to the surrounding

circumstances and apparent purpose which the parties sought to accomplish."  *Thompson v.

Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) (internal quotation marks and citation omitted).  "It is

well settled that a contract is to be construed in accordance with the parties' intent, which is

generally discerned from the four corners of the document itself."  *MHR Capital Partners LP v.

Presstek, Inc.,* 12 N.Y.3d 640, 645 (2009); *accord JA Apparel Corp. v. Abboud*, 568 F.3d 390,

396 (2d Cir. 2009).  "[A] written agreement that is complete, clear and unambiguous on its fact

must be enforced according to the plain meaning of its terms."  *Id.*  The initial question of

whether a "contract is unambiguous is a question of law for the court."  *Continental Ins. Co. v.

Atlantic Cas. Ins. Co.,* 603 F.3d 169, 180 (2d Cir. 2010).

　　"When the language of a contract is susceptible to different interpretations and where

there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning

becomes an issue of fact precluding summary judgment."  *Lucent v. International Business

Machines Corp.*, 310 F.3d 243, 257 (2d Cir. 2002); *see GSI Commerce Solutions, Inc. v.

BabyCenter L.L.C.*, 618 F.3d 204, 209 (2d Cir. 2010) ("An agreement is ambiguous only if it is

capable of more than one meaning when viewed objectively by a reasonably intelligent person

who has examined the context of the entire integrated agreement").  However, "[l]anguage whose

19

meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Abboud*, 568 F.3d at 396. "[W]here the language of a contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court." *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009). "In interpreting an unambiguous contract, the court is to consider its [p]articular words not in isolation but in light of the obligation as a whole and the intention of the parties as manifested thereby, but the court is not to consider any extrinsic evidence as to the parties' intentions." *Abboud*, 568 F.3d at 396 (internal quotation marks and citations omitted); *see LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions").

In the instant matter, addressing the preliminary question of ambiguity, the Court concludes that the integrated contracts at issue are unambiguous. Moreover the parties do not assert that the contracts are ambiguous. It is undisputed that MDI entered into four contracts[8] and

---

[8]First, Purchase Order 32365 dated January 13, 2000 lists three line item descriptions: (i) NRE/set-up; (ii) two engineering models; and (iii) an SEU test board brick and logic. (*Id.*, Ex. 12.) There were two revisions to Purchase Order 32365, the final revision on August 3, 2001, which canceled the line item for two engineering models. (*Id.*, Ex. 73.) Under this contract, MDI furnished Brookhaven with, *inter alia*, (i) schematics and layouts of a +12V Vicor/Brand X SEU Board and family tree, and (ii) "Model 53470" test procedure. (*Id.*, Exs. 27-29, 94.) The contract states Attachment A applies to the purchase order. (*Id.*)

Second, Purchase Order 44125 dated November 2, 2000, lists six line item descriptions: (i) schematic and parts list; (ii) layout; (iii) circuit analysis; (iv) module electrical tests; (v) two pre-production power supplies; and (vi) ten brick radiation test samples, and contained a

two NDAs with the government to develop and produce power supplies for use in the ATLAS

Detector at the Large Hadron Collider at CERN.  An examination of the four contracts reveals

---

production option which was exercisable through December 31, 2002.  (*Id.*, Ex. 37.)   The pre-production and option production power supplies were to meet Revision B of the US Atlas tolerant Power Supply Specification.  (*Id.*, Exs. 1, 37.)  There were three revisions to Purchase Order 44125, and the third revision added (vii) a dogleg package and (viii) additional charges.  (*Id.*, Ex. 14.)  Under this contract, MDI furnished Brookhaven with, *inter alia*, (i) schematics and layout, (ii) a parts list, (iii) circuit analysis and modules, and (iv) a transformer drawing used in the modules under this purchase order.  (*Id.*, Exs. 30-35, 94.) The contract states Attachment A applies to the purchase order.  (*Id.*)

Third, Purchase Order 66116, dated November 19, 2002 and signed on December 10, 2002, reflects that BSA contracted with MDI to develop and deliver, *inter alia,* two prototype LVPS units, and contained an option for Brookhaven to purchase two First Articles and 68 LVPS production units.  (*Id.*, Ex. 17 ¶ 13, Ex. A.)   The first Purchase Order 66116 lists four line item descriptions: (i) NRE; (ii) two prototypes; (iii) a formal review; and (iv) a thermocouple test.  (*Id.*)  Purchase Order 66116 incorporated MDI quotation Q02/0239-3, which broke down the NRE as follows: (i) heatsink and overall layout ($29,355); (ii) PWB and cover design ($23,175); (iii) detail assembly drawings/diagrams ($9,970); and (iv) final assembly drawings/diagrams ($8,446), less a credit for a prior engineering study ($8,850).  (*Id.*, Ex. 17, Ex. A; Ex. 63.)  In addition the contract provides that this effort was detailed in the US Atlas Radiation Tolerant Power Supply Work Statement and Specifications, Revision B except as clarified by MDI's Review of Work Statement and Specifications dated 9/12/02 and the MDI quotation with certain exceptions as to MDI's Supplemental Terms and Conditions.  (*Id.*, Ex. 17, Ex. A; Ex. 10.)  The contract states that in the event of a conflict or inconsistency between Brookhaven's and the Contractor's terms and conditions, Brookhaven's terms and conditions shall take precedence.  (*Id.*)  Purchase Order 66116 states that Attachment A applies to this order and Attachment B (PSBNP-1287) (Facilities License) applies to this order with the exception of clauses 1, 2 and 4.  (*Id.*)  As set forth in the factual background supra, Brookhaven exercised its production option in Revision 4 to the purchase order, dated April 7, 2004, incorporated the US Atlas Radiation Tolerant Power Supply Production Specification, #ATLAS LARG PS-001, dated 4/1/2004 and MDI 1ˢᵗ Article and Production Schedule dated 4/12/2004, and added a Government property clause.  (*Id.*, Ex. 57.)  Revision 5 dated May 14, 2004 contains the same clause.  (*Id.*, Ex. 71.)  Revision 6 dated September 20, 2004 indicated it was a change order to cancel lines 5 and 6 and to transfer the line items to Purchase Order 91308.  (*Id.*, Ex. 72.)

Lastly, Purchase Order 91308 dated September 16, 2004 states that the purchase order replaces line items 5 and 6 of Purchase Order 66116 and that all terms and conditions and milestone payment schedule from Purchase Order 66116 apply to this order.  (*Id.*, Ex. 22.)  Attachment A applies to the purchase order.  (*Id.*)

that the documents incorporate terms and conditions from certain specified attachments that bear

on the respective rights of the parties to the information and products furnished.  The first two

contracts, Purchase Orders 32365 and 44125, entered into in 2000, related to the development of

the LVPS and incorporated Attachment A[9] to the items furnished under the contracts.  Of the

latter two contracts, Purchase Order 66116 entered into in 2002, likewise related to the

development of LVPS and incorporated Attachment A, but also had a production option, which

BSA exercised on April 7, 2004[10] and which was moved to Purchase Order 91038 for accounting

purposes in September 2004.  Under the express terms of Attachment A, title to items furnished

under each of these contracts passed to the Government upon acceptance.  (*Sacks Decl.,* dated

April 23, 2010, Exs. 14, 17, 22, 37, 57, 71, 72, 103, 104.)

In addition to Attachment A, Contracts 66116 and 91038 incorporate an Attachment B[11]

which gave the Government unlimited rights in (i) data first produced in the performance of the

---

[9]Each purchase order stated on its face that the seller, MDI,  agreed to be bound by the terms and conditions contained Attachment A.  (*Sacks Decl.,* dated April 23, 2010, Exs. 14, 17, 22, 37, 57, 71, 72, 103, 104.)

[10]In Revision 4 to Purchase Order 66116 dated April 7, 2004 wherein BSA exercised its production option for the two First Articles and 68 production units, the Government added a clause providing that "[a]ll material and work covered by progress payments shall become the sole property of the Government of the United States."  (*Id.*, Ex. 57.)

[11]Purchase Order 66116 states on its face that "Attachment B Intellectual Property Provisions For A Contract With A Small Business or Nonprofit Corporation (Non-Educational) For Research, Demonstration or Development Work PSBNP-1287 (Facilities License) with the exception of clauses 1, 2 and 4 are attached hereto and shall apply to this order."  (*Id.*, Ex. 17, Ex. A and B.)   Although MDI argues that the version of Attachment B attached to the Complaint was a mistake and that an earlier version (PLB-1096) should apply (*Esatto Decl.*, dated April 23, 2010, Ex. 13), the Court finds the clear terms of Purchase Order 66116 incorporates the PSBNP-1287 version.  Contract 91038 states on its face that all terms and conditions of Purchase Order 66116 apply to this order.  (*Sacks Decl.,* dated April 23, 2010, Ex. 17, Ex. C, 22, 72.)

contract; (ii) form, fit and function data delivered; (iii) data delivered that constitutes manuals and instructional materials; and (iv) all other data delivered under the contract. (*Id.*, Ex. 17, Ex. A.) Attachment B defines unlimited rights as "the right of Government to use, disclose, reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly, in any manner and for any purpose, and to have or permit others to do so." (*Id.*, Ex. 17, Ex. A, ¶ 6(a).) Attachment B defines data as "recorded information, regardless of form or the media on which it may be recorded . . . and includes technical data and computer software." (*Id.*) Moreover, Attachment B contains a copyright provision for data first produced in the performance of the contract and gave the Government and others acting on its behalf "a paid-up, nonexclusive, irrevocable worldwide license in such copyrighted data to reproduce, prepare derivative works, distribute copies to the public, and perform publicly and display publicly." (*Id.*, Ex. 17, Ex. A, ¶ 6(c)(1).) Under Attachment B, data which MDI considers to be limited rights data, viz. data developed at MDI's expense that embodied trade secrets, could be withheld if MDI "identif[ied] that data being withheld and furnish form, fit and function data in lieu thereof." (*Id.*, Ex. 17, Ex. A, ¶ 6(g)(1).) Finally, Purchase Order 66116 expressly provides that "in the event of a conflict or inconsistencies between Brookhaven's and [MDI's] terms and conditions, Brookhaven's terms and conditions shall take precedence." (*Id.*, Ex. 17, Ex. A.)

In addition to the attachments incorporated into the respective contracts, there were two non-disclosure agreements in place between BSA and MDI for the periods (i) March 15, 2004 through March 14, 2005 and (ii) November 15, 2005 through November 14, 2006. Between March 15, 2005 and November 14, 2005 there was no NDA in place. Under the express terms of the agreements, proprietary information was limited to: (i) any written information originating

from MDI related to the items of MDI manufacture or MDI intellectual property in the field of

DC/DC converter products and marked proprietary and restricted; (ii) any electronic version of

such written information originating from MDI and marked as proprietary and restricted; and (iii)

any oral information from MDI, described at the time of disclosure as proprietary or restricted,

and reduced to writing and delivered to the receiving party within 30 days of such disclosure.

(*Id*., Exs. 2, 3.)  The NDAs required protection of MDI proprietary information for three years

after the termination of the NDA.  (*Id*.)  Thus, for information and products furnished under the

contracts and NDAs to be accorded trade secret status, the language of these documents make

clear that MDI must have disclosed the proprietary information to BSA in writing and marked it

proprietary or confidential.

      The Court will examine the proprietary information claimed by MDI, applying the

unambiguous terms and provisions of the contracts and NDAs to the record evidence (as well as

address any of the parties' challenges to the contracts and/or NDAs within the context of the

claimed trade secret) to determine whether MDI possessed a trade secret in the information

and/or products furnished under the contracts.

**2.**    **The Alleged Trade Secrets**

      MDI identifies the proprietary information allegedly misappropriated by Defendants as

follows:

> [t]he trade secrets for use in a radiation tolerant power supply having non-
> radiation hardened components set forth in attachment A [of the interrogatory
> response], as well as the trade secrets embodied in [the schematics and drawings
> comprising] Document nos. MDI 1913 to 2062 constitute confidential and/or
> proprietary information that was misappropriated and/or wrongfully disclosed to
> one or more third party by BSA and/or AE[IS].  Investigation is continuing and
> additional answers may be provided.

24

(*Id.*, Ex. 26).  Attachment A enumerates 30 alleged trade secrets purportedly disclosed by Defendants.  (*Id.*)  In Plaintiff's opposition papers, MDI claims it possessed the following proprietary and trade secret information: (a) the LVPS prototype control board schematic disclosed to defendant AEIS; (b) the LVPS production unit control board schematic disclosed to defendant AEIS; (c) an MDI power module schematic that was disclosed to Dr. Simion of CERN; (d) trade secrets gleaned from MDI circuit schematics disclosed to Dr. Simion; (e) technical drawings created by Dr. Simion with the aid of trade secrets gleaned from various schematics and disclosed to AEIS and others; and (f) three written disclosures containing trade secrets gleaned from MDI circuit schematics and disclosed to Ensil.  The Court addresses each of MDI's claimed trade secrets seriatium.

### (a)  The LVPS Prototype Control Board Schematic

A review of the record indicates that MDI's prototype unit control board schematic was disclosed to BSA during the summer of 2003 when James Kierstead, a research engineer at BNL, received a copy of the control board schematic for the LVPS prototype.[12]  (*Kierstead Decl.*, dated March 26, 2010, ¶ 12.)  The schematic is dated January 24, 2003, and therefore on its face the document was data first produced under the 66116 Contract.  (*Sacks Decl.,* dated April 23, 2010, Ex. 91.)  Moreover, as this prototype schematic was dated and disclosed prior to March 15, 2004, MDI disclosed the schematic without an NDA in place.  Under the provisions of Attachment B which apply to the 66116 Contract, BSA had unlimited rights to the schematic, and therefore

---

[12]Although MDI questions the circumstances under which Mr. Kierstead received a copy of the schematic as "vague" and asserts it is unclear whether the schematic was disclosed to BSA prior to the first NDA, the Court notes that the schematic is dated January 24, 2003 and therefore was first produced when the 66116 Contract was in place.  (*Sacks Decl.,* dated April 23, 2010, Ex. 91.)

BSA did not have a contractual duty to keep the schematic confidential.

Notwithstanding, MDI argues that even accepting that the schematic was disclosed prior to the first NDA, the document is still entitled to trade secret status because of the existence of a confidential relationship with BSA before the first NDA.  Thus, the Court considers whether "the factual contours of their relationship created a duty of fidelity" on [BSA's] part." *Abernathy-Thomas Engineering Co. v. Pall Corp.,* 103 F. Supp.2d 582, 601 (E.D.N.Y. 2000).  "Under New York law, a duty of fidelity can in rare instances arise from a relationship of trust and confidences between two companies." *Scientific Components Corp. v. Sirenza Microdevices, Inc.,* No. 03-CV-1851 (NGG) (RML), 2006 WL 2524187, at *26 (E.D.N.Y. Aug. 30, 2006) (internal quotation marks and citations omitted).  In considering whether such a duty exists between the parties, "courts look to factors such as whether the relationship was one of economic equals, or was one of dependency of a weaker company on a more dominant one, . . . the length of the relationship, and whether the defendant contractually required the plaintiff to turn over its proprietary information." *Id.*

Here, the parties' relationship was defined by the contractual agreements and NDAs which unambiguously specified the conditions under which the information and products furnished would be accorded confidential status.  When MDI wanted to protect its trade secrets, it would customarily have a non-disclosure agreement in place prior to the exchange of proprietary information and would only disclose confidential information without one where the information did not contain trade secrets.[13]  (*See Sacks Decl.,* dated April 23, 2010, Ex. 100 at

---

[13]MDI's Vice President and General Manager, Henry Streigl testified on September 3, 2009:

    A:      As a common practice of Modular Devices, it is customery to have a non-

60-61.)  According to the deposition testimony of MDI's President, Steve Summer, in September

2009, MDI did not "discuss any proprietary circuits or assemblies or techniques" with

Brookhaven prior to March 15, 2004.  (*Id*., Ex. 93.)  In recalling the course of the relationship

between the parties on projects relating to power supplies, Mr. Summer testified:

> Q:    MDI had been working with Brookhaven on projects relating to the power
>       supply going back to 1999 or 2000; isn't that right?
>
> A:    Could you be more specific?
>
> Q:    You had a CRADA with Hedio Takai and Jim Kierstead; is that right?
>
> A:    Yes.
>
> Q:    And that went back to 2000 or 2001; is that right?
>
> A:    That's correct.
>
> Q:    Did you have an NDA in connection with the work on the CRADA?
>
> A:    No, I don't think so.
> Q:    Do you recall a project with Brookhaven number 44125?
>
> A:    No.
>
> Q:    Do you recall that prior to the 66116 project there were two prior projects that

---

> disclosure in effect before the exchange of proprietary information.
> Q:    Why is that?
> A:    That is to guard and protect trade secrets, intellectual property, which are the
>       means by which we make our living.
> Q:    And why did Modular Devises enter into the non-disclosure agreement with
>       Brookhaven which was marked as Exhibit 8?
> A:    To guard those secrets.
> Q:    In what circumstances did MDI provide confidential information to customers
>       without a non-disclosure agreement in place?
> A:    In the circumstances whereby we judged that the information would not reveal
>       trade secrets, or intellectual property, for that matter.

(*Id*.)

27

> MDI worked on with Brookhaven relating to power supplies for the CERN Atlas Detector?
>
> A:     There was a test programming that we worked on with them.
>
> Q:     And do you recall the work on test programs with Brookhaven relating to the power supply for the Atlas Detector went back to 2000?
>
> A:     Yes it did.
>
> Q:     Is it also correct that Exhibit 8 was the first non-disclosure agreement you had with Brookhaven?
>
> A:     Probably.  But Brookhaven – we didn't discuss any proprietary circuits or assemblies or techniques with Brookhaven in connection with the earlier work.
>
> Q:     So all of the discussions with Brookhaven prior to March 15, 2004, involved non-proprietary information, as far as you are concerned.
>
> A:     As far as I know, yes.

(*Id.*, Exs. 93, 157 at 5-6.)  Hence, the contours of the business relationship between MDI and BSA, which are governed by the terms and provisions of the contracts and NDAs between the parties, fail to raise a material issue of fact that BSA's relationship with MDI gave rise to a separate duty of fidelity.

Moreover, there is no evidence in the record that the parties had an implied confidential relationship prior to the first NDA.  *See Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 377 (2d Cir. 2000) ("An implied-in-fact contract requires such elements as consideration, mutual assent, legal capacity and legal subject matter") (internal quotation marks and citation omitted); *see Bulger v. Royal Doulton, PLC*, No. 05 Civ. 7709 (DAB), 2006 WL 3771016, at *6 (S.D.N.Y. Dec. 19, 2006) (holding an implied confidential relationship "requires mutual assent evincing the intention of the parties to be bound by specific contractual terms").  As previously

28

discussed, the parties' actions evince that prior to the first NDA, MDI did not disclose proprietary circuits or assemblies or techniques with Brookhaven and when MDI wanted to protect its trade secrets it customarily required an NDA prior to disclosure. Because MDI has adduced no evidence of BSA's assent to be contractually bound by a confidential relationship beyond the express provisions of the parties' contract or the entry of an explicit NDA, such a contract cannot be implied.

Plaintiff also asserts for the first time in its opposition papers to the summary judgment motion that MDI's standard and supplemental terms and conditions ("T & Cs")[14] protected proprietary information disclosed by MDI to Defendants prior to the first NDA on March 15, 2004 and therefore all the drawings or schematics disclosed from 1999 to 2007 were identified by MDI as proprietary. (Pl.'s Mem. of Law in Opp., at 17-19; *Summer Decl.*, dated May 21, 2010, ¶¶ 2-4, 6; *Striegl Decl.,* dated May 21, 2010, ¶¶ 3-4.) Plaintiff's assertion, based on the declarations of Mr. Summer and Mr. Striegl submitted after the conclusion of their respective deposition testimony, is unavailing. In this Circuit, "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts

---

[14]Plaintiff maintains that MDI's standard and customary practice was to attach MDI's T&Cs to MDI's quotations and purchase orders, which provide for the protection of MDI's proprietary information in connection with technical data including, but not limited to, drawings and schematics provided or generated in connection with a contract or proposed contract. (*Summer Decl.*, dated May 21, 2010, ¶¶ 2-3; *Striegl Decl.,* dated May 21, 2010, ¶¶ 3-4.) However, the Contract 66116 expressly incorporates BSA's terms and conditions in Attachments A and B and expressly states on its face that in the event of a conflict or inconsistencies between BSA's and MDI's terms and conditions, BSA's terms and conditions take precedence. (*Sacks Decl.,* dated April 23, 2010, Ex. 17, Ex. A.) Thus, to the extent that MDI's T&Cs apply to Contract 66116, the contract language is clear that the provisions in Attachments A and B control.

[plaintiff's] own prior testimony." *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir. 2001);

*Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party

may not create an issue of fact by submitting an affidavit in opposition to a summary judgment

motion that contradicts the affiant's previous deposition testimony.") (internal quotation marks

and ellipsis omitted).  Accordingly, the statements of fact made for the first time in the Summer

Declaration and Steigl Declaration and which controvert their prior depositions will not be

considered.

In short, given (i) MDI's prototype unit control board schematic was dated and disclosed

prior to the first NDA entered into between the parties, and (ii) the schematic was produced under

the 66116 contract and therefore BSA had unlimited rights in the document, it cannot be said that

MDI possessed a trade secret in the schematic.

### (b) The LVPS Production Unit Control Board Schematic

A review of the record reveals that MDI provided Brookhaven a copy of the production

unit control board schematic on July 19, 2004.  (*Sacks Decl.,* dated April 23, 2010, Ex. 64.)  The

schematic was furnished pursuant to BSA's request for that schematic in order to build a circuit to

monitor the LVPS units at BNL and CERN.  (*Kierstead Decl.*, dated March 26, 2010, ¶ 15.)  The

schematic is dated May 25, 2004, and therefore was delivered during the 66116 Contract and with

an NDA in place.  (*Sacks Decl.,* dated April 23, 2010, Ex. 64.)

Plaintiff asserts that this schematic cannot be considered data "first produced" in the

performance of the 666116 contract because it contains trade secrets and confidential information

developed by MDI, solely at MDI's own expense, prior to MDI's work with BSA on the ATLAS

program and pursuant to the Representations and Certifications to the 66116 Contract which

provides, "[a]ll data previously developed at contractor's expense" qualified as limited rights data.

(*Striegl Decl.,* dated May 21, 2010, ¶ 2; *Esatto II Decl.*, dated May 21, 2010, Ex. 82 at ¶ 17.)  The

Brookhaven Representations and Certifications states in pertinent part:

> REPRESENTATION CONCERNING DATA RIGHTS
>
> Offeror has reviewed the requirements for the delivery of data or software and states –
>
> . . . . Data proposed for fulfilling such requirements qualify as limited rights data
> or restricted computer software and are identified as follows:
> All data previously developed at contractor's expense

(*Id*.)  The express terms of the 66116 Contract, however, provide that for data to qualify as

limited rights data,

> the Contractor shall withhold such data and not furnish them to the Government
> under this Contract.  As a condition to this withholding, the Contractor shall
> identify the data being withheld and furnish form, fit and function data in lieu
> thereof.

(*Sacks Decl.,* dated April 23, 2010, Ex. 17, Ex. A at Appendix B, § 6(g)(1).)  Significantly, under

the unambiguous terms of the 66116 contract, Attachment A makes clear:

> By signing this Agreement, delivering the supplies or performing the requirements
> indicated herein, the Seller agrees to comply with all the terms and conditions and
> all specifications and other documents incorporated in this Agreement by reference
> or otherwise. . . .

(*Id.*, Ex. 17, Ex. A.)  Thus in order for Plaintiff to claim that the schematic qualified as limited

rights data, MDI was required to identify the data being withheld and thereafter furnish form, fit

and function data.  There is no evidence in the record that MDI made such an identification.

Nevertheless, Plaintiff contends in the alternative that the terms of the NDA supersede the

Data Rights Clauses of the 66116 Contract and therefore BSA did not obtain unlimited rights in

the production unit control board schematic.  Notably, the NDAs and the Rights in Data Clauses

concern different protections and therefore on its face the provisions of the integration clause of

the NDA does not necessarily supersede the 66116 Contract.  The integration clause of Paragraph

12 of the NDA entered on March 15, 2004, states:

> This agreement contains the entire understanding relative to the protection of
> information exchanged in connection with the subject program and supersedes any
> prior or collateral understanding between the Parties.  This agreement shall apply
> in lieu of and notwithstanding any related statements associated with any particular
> information exchanged hereunder.  This agreement may not be modified except by
> subsequent agreements in writing by authorized representatives of the parties.

 (*Sacks Decl.,* dated April 23, 2010, Ex. 2, ¶ 12.)  The NDA pertains to the protection of

proprietary information exchanged between MDI and BSA.  The Rights in Data Clauses of

Contract 66116 (which includes Attachments A and B) are directed to the Government's rights in

data first produced under the contract or delivered under the contract and the Government's right

of title to items furnished under the contracts.  (*Id.*, Ex. 17, Ex. A and C.)

    In any event, on April 7, 2004, the parties entered into a 4th Revision to Purchase Order

66116 (i) wherein BSA was to make milestone payments against portions of the work, (ii) which

added a Government property clause that clearly stated "[a]ll material and work covered by the

progress payments shall become the sole property of the government of the United States," and

(iii) which made clear that all prior terms and conditions of the 66116 Purchase Order remained

unchanged, including the incorporation of Attachments A and B.  (*Id.*, Ex. 57.)  Having signed

and accepted the revision to Contract 66116, MDI agreed to be bound by the clear language of the

contract and the terms and conditions of the incorporated attachments, including the express

provision on the face of the contract stating that "in the event of a conflict or inconsistencies

between Brookhaven's and [MDI]'s terms and conditions, Brookhaven's terms and conditions

shall take precedence." (*Id.*, Ex. 17 at Ex. A.)  Here, MDI delivered the logic schematic for the power supply pursuant to the 66116 Purchase Order under which BSA contracted for the production of radiation tolerant power supplies.  (*Id.*, Ex. 64.)

Under the plain meaning of the contracts and NDAs between the parties, the Court concludes that because (i) MDI did not identify the data being withheld (and furnish form, fit and function data in lieu thereof) in order for the schematic to be given limited rights protection, and (ii) the terms of the NDA did not supersede the Data Rights Clauses of the 66116 Contract, the Government had unlimited rights in the production unit control board schematic because it was data first produced under the contract.[15]  Accordingly, MDI did not possess a trade secret in this schematic.

(c)      An MDI Power Module Schematic

A review of the record indicates that MDI furnished a copy of the power module

---

[15]Plaintiff's argument that the schematic was not specified to be delivered in the purchase order and therefore pursuant to the "Rights in Data–Special Works" contained in Attachment B to the RFQ for production of the Radiation Tolerant Power Supplies dated September 10, 2002, BSA did not obtain unlimited rights likewise fails.  Contract 66116 incorporated Attachment A and Appendix B (including the "Rights in Data–General Clause").  The 12/92 version of Attachment B (which was specified on Purchase Order 66116) was attached to MDI's Verified Complaint and the 66116 Contract.  Although Plaintiff urges that the prior Attachment B apply to the contract, Attachment A makes clear that with respect to Contract 66116:

> This Agreement expresses the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any prior oral and written agreement between the parties.  It may only be modified in writing executed by both Brookhaven and the Seller.

(*Sacks Decl.,* dated April 23, 2010, Ex. 17, Ex. A.)  Thus under the unambiguous language of the contract, any prior written agreement was superseded by the Attachment B appended to Contract 66116 that the parties signed and to the Verified Complaint.

33

schematic to Brookhaven pursuant to Purchase Order 44125.  (*Esatto Decl.*, dated April 23, 2010,

Ex. 78; *Sacks Decl.,* dated April 23, 2010, Ex. 11.) The schematic is dated July 13, 2001 and

therefore the schematic was delivered during the 44125 Contract without an NDA in place.  (*Id.*)

Plaintiff argues that even in the absence of an NDA the document is entitled to trade secret status

because the schematic contained MDI trade secrets, was marked proprietary and therefore BSA

was under an obligation to protect the schematic from disclosure to Stefan Simion, a scientist

from CERN.  Plaintiff's argument, however, overlooks the fact that under the 44125 Contract,

which expressly incorporates Attachment A, "title to items furnished under this Agreement shall

pass to the Government upon acceptance, regardless of when or where Brookhaven takes

possession."  (*Sacks Decl.,* dated April 23, 2010, Exs.11, 37, 103.)   Hence, because Brookhaven

owned the schematic, it cannot be concluded that MDI  possessed a trade secret in the document.

### (d)      MDI Circuit Schematics

Plaintiff maintains that BSA disclosed proprietary information to Dr. Simion[16] gleaned

from MDI circuit schematics which Dr. Simion in turn used to reverse engineer MDI power

supplies and create a set of schematics of the LVPS circuit.  According to MDI, James Kierstead

and Wahfun Eng accessed MDI schematics at the MDI facility multiple times to gain knowledge

of MDI's proprietary information and trade secrets and then disclosed the information to Dr.

Simion in contravention of the NDA.   In response, Defendants assert that the schematics created

by Dr. Simion were not based on the disclosure of any proprietary information by Brookhaven to

---

[16]Commencing in 2005, Dr. Simion was working on installing the MDI power supplies at CERN, and during this time he had contact with individuals at Brookhaven who were involved in the MDI power supply program, including Mr. Kierstead and Mr. Lanni.  (*Esatto II Decl.*, dated May 21, 2010, Ex. 118 at 24-25.)

Dr. Simion, but rather were based on Dr. Simion's independent work with the LVPS units, and the measurements done on the LVPS units by Dr. Simion and Brookhaven at Dr. Simion's request.

"Trade secret law . . . does not offer protection against discovery by . . . so-called reverse engineering." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 476 (1974). "Reverse engineering a product to determine its design specifications is therefore permissible as long as the means used to get the information necessary to reverse engineer is in the public domain, and not through the confidential relationship established with the maker or owner of the product." *Kanant, Inc. v. Seeley Machine, Inc.*, 244 F. Supp. 2d 19, 37-38 (N.D.N.Y. 2003). "The proper focus of inquiry is not whether an alleged trade secret can be deduced by reverse engineering but rather, whether improper means are required to access it." *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 223 (S.D.N.Y. 1988). A review of the record indicates that no improper measures were used by Dr. Simion (and/or Defendants) to create the schematics. It is undisputed that MDI entered into contracts with BSA to develop the LVPS units which would be delivered and installed in the ATLAS Detector at CERN, and implicit in the agreements was the Government's objective to deliver functioning power supplies. With respect to the LVPS units MDI delivered under Contracts 66116 and 91308, BSA had title to, and thereby ownership of, the products pursuant to Attachment A to the contracts, including the units delivered to CERN. Full title permitted BSA to reverse engineer or have others reverse engineer the units. *See Sacks Decl.,* dated April 23, 2010, Ex. 97 at 3-4; Ex. 106 at 36-37 (MDI's government contracts expert (i) explaining that once an entity had title to a schematic or product, it could "use it. In terms of trader secret law, they can reverse engineer it. They can do whatever they want with it. Destroy it" and (ii) stating that

reverse engineering of a mechanical product is a "legitimate way around claims by a contractor that data is proprietary").

In the instant matter, the evidence shows that Dr. Simion reverse engineered the power supplies delivered to BSA or CERN using measurements made by Dr. Simion and the Government's personnel at his request, without reference to MDI's trade secrets or information gleaned from MDI's schematics or other proprietary information.

By way of background Dr. Simion was involved in the installation of the LVPS units for the ATLAS Detector at CERN beginning in 2005, and as the delivered units continued to fail despite a retrofit by MDI, Dr. Simion began in July 2006 to inspect, probe and reverse engineer a LVPS unit at CERN in an attempt to get a better understanding of how the units were supposed to work and why they were failing. (*Esatto II Decl.*, dated May 21, 2010, Ex. 118 at ¶ 7.) Within one or two days, Dr. Simion states that he had produced some hand drawings based on his studies on a module he had removed from the unit. (*Id.*) Dr. Simion states that he had studied information regarding the components of LVPS, including Texas Instruments application notes and data sheets, and from this he had an idea of what the circuit should look like. (*Id.* at ¶ 8.) On July 25, 2006, Dr. Simion visited BNL to inspect the failed LVPS units and attempt to identify the reasons for the failure, and during his visit opened one of the failed MDI units, removed the top printed circuit board ("PCB"), examined its components and parts numbers and created schematics based on his inspection which he sent to Defendants on July 27, 2006. (*Id.* at ¶¶ 9-11.) Thereafter Dr. Simion employed techniques on the PCB, attempted to meet with MDI to assist in ascertaining the reasons for the failures of the units, and when MDI declined, he gathered information from viewing the MDI unit and requesting certain measurements to produce a report

36

entitled "LVPS Questions and Answers" dated August 7, 2006, which, *inter alia,* identified

possible causes for the failures and generated schematics for top and bottom PCBs. (*Id.* at ¶ 15.)

When asked the steps he employed in conducting his reverse engineering on the unit, Dr.

Simion testified as follows:

Q:   Could you explain for the jury [sic] in a general way how you went about how you went about doing your reverse engineering and preparing the schematics and reports that are attached to your Declaration?

A:   So I should go and describe the steps?

Q:   Yes, please.

A:   I removed the top printed circuit board from on module and took three digital pictures of each side of the top board and of the component side of the bottom board.  I also took the top board with me.  I used the pictures I had and the top board I had in my hand to write down what are the components, the integrated circuits on the board and gradually took – start drawing how they are connecting – connected.

Many, if not most of the connections are present on the outer layer and the few are buried.  And in that case, I used an ohm meter.

I was also helped by the literature that I could find on internet about specific part numbers, and also more general literature about various switch mode power supply designs.

So I gradually transposed my drawings from hand drawings to electronic form in PADS software, P-A-D-S.  The reports included part of the schematics, comments about how I believed part of the circuit was supposed to work and questions about other parts that were uncertain at the time.

And also later on, I had added electrical measurements that I was doing or that somebody else was doing, and in that case, it was mentioned in the – in the report.

Q:   Did you use any of the information that you got from Brookhaven, other than the measurements they did at your request, about the MDI power supplies – let me start over.

> Did you use any information about the MDI power supplies that you
> got from Brookhaven other than the measurements that they did at
> your request in preparing your schematics, your reports or doing
> your reverse engineering?

A:      I did not.

(*Sacks Decl.,* dated April 23, 2010, Ex. 102.)

Contrary to Plaintiff's assertions, there is no record evidence that Mr. Kierstead or Mr.

Eng provided Dr. Simion with proprietary information gleaned from MDI's circuit schematics.[17]

---

[17] Plaintiff fails to produce evidence to support its allegation that Mr. Kierstead and Mr. Eng disclosed proprietary information to Dr. Simion which he used to reverse engineer the MDI power supplies and create schematics. (*See* Pl. 56.1 Stmt. of Additional Facts, ¶¶ 4-5 and referenced exhibits; Pl. Mem. of Law in Opp. at 3-7, 13-14.)  For example, MDI proffers Exhibit 45 to show that Mr. Kierstead and Dr. Simion were working together to reverse engineer the LVPS: "Jim [Kierstead] and Stefan [Simion] are going well along.  We should explore the possibility of having Stefan on our team."  (*Esatto Decl.*, dated April 23, 2010, Ex. 45.) However, upon close review, the document is an e-mail between two BNL employees, Francesco Lanni, Deputy Group Leader for the Omega Group of BNL, and Howard Gordon, Senior Physicist and Deputy Chair of BNL Physics Department, where the two scientists discussed using another scientist on their team but were concerned that Jim was not convinced how useful that scientist would be, noted that "[s]urprisingly -in part - Jim and Stefan are going well along," suggested the possibility of having Dr. Simion join their team to reverse engineer and queried whether he was covered by the NDA with MDI.  This internal e-mail concerns a future suggestion, not an actual fact that information gleaned was given from Mr. Kierstead to Dr. Simion.  In another example, MDI proffers Exhibit 57 to indicate that Dr. Lanni made a similar statement in a summary memorandum under the heading "Reverse Engineering": . . . . "Many details are of course still missing but Stefan and Jim could reach a basic understanding how a module works."  (*Id.*, Ex. 57.)  This document is entitled a "Summary of LVPS activities for week: Mon 7/31 - Fri 8/4" and provides a summary of the events that caused failures on the units, raises various alternatives and back up plans, and sets forth the status of the LVPS units.  (*Id.*)  In context, the summary shows that Dr. Simion volunteered to use the power unit and PC boards directly, not any trade secrets of MDI, to find possible root causes for the failures.  Moreover, the statement does not concern the fact that Stefan was using MDI schematics or that Mr. Kierstead provided the information to him, but speaks in the future tense that they "could", as one of various considerations:

> Stefan Simion was invited in BNL to help in identifying possible problems with
> the MDI units.  The main question to answer is to verify whether we have only to
> deal with workmanship issues or whether an underlying fundamental design flaw

Plaintiff states that the following statements made by Dr. Lanni at his deposition show an

improper disclosure of proprietary information:

> Q:      Why did you say "Jim and Stefan are going well along"?

> A:      I was saying that specifically because Jim, I know Jim and I know
> Stefan reasonably well and when you have to form a team,
> personalities count as well.

> Q:      Did Stefan obtain information from James Kierstead, yourself and
> others at BSA to assist him in doing his reverse engineering of the
> MDI power supplies?

> A:       . . . . we support him somewhat when he was making questions
> specifically to detail some aspects he couldn't find out.

(*Esatto II Decl.*, dated May 21, 2010, Ex. 96 at 56-62.)  However, once placed in the context of

Dr. Lanni's complete answer to whether Stefan obtained information from Defendants, it becomes

clear that Dr. Lanni did not state that Mr. Kierstead and/or others disclosed trade secrets or

proprietary information gleaned from such documents to Dr. Simion:

> A:      As was stated earlier, the investigation and reconstruction of the schematics
> was basically made by Stefan before [he] came to Brookhaven and during –
> while [he] was in Brookhaven at his own determination and investigation.
> We support him somewhat when he was making questions specifically to
> detail some aspects he couldn't find out.  As far as this particular one, it
> clearly states the retrieval of information or discovery of information was
> made directly analyzing the PCB boards because there was no information
> available whatsoever of BNL/BSA, we don't have information about the
> nature of the power modules, which is what it is about here, the power
> modules.

---

exists.  Due to the lack of information available, Stefan volunteered to collect as
much information as possible by analyzing directly the PC boards.  A block
diagram of the power modules circuitry has been completed.  Many details are of
course still missing but Stefan and Jim could read a basic understanding of how a
module works.

(*Id.*)

(*Id.*)  Dr. Lanni's position is consistent with Dr. Simion's statements.  Moreover, Plaintiff's

assertion that "Simion admitted to receiving information that he had no way of knowing whether

the information he received was proprietary or not," (id., Ex. 115 at 85-86), again needs to be

placed in the context of Dr. Simion's deposition testimony:

> Q:     The information you received from Mr. Kierstead about the MDI
>        power supplies, did you know whether that was proprietary
>        information from MDI?
>
> A:     I know it was not.
>
> Q:     How did you know it was not at the time?
>
> A:     I did not receive anything with the mention proprietary information.
>
> Q:     How do you know what was proprietary information of MDI at that
>        time?
>
> A:     The only way to know if it were written or if somebody would have
>        told me.
>
> Q:     So you have no way of knowing whether or not the information that
>        Mr. Kierstead gave you about the power supplies was proprietary or
>        not?
>        Objection, asked and answered. Objection argumentative.
>
> A:     That is correct.

(*Id.*)  When so placed, this testimony does not establish that Mr. Kierstead disclosed proprietary

information, but rather establishes that Dr. Simeon did not receive any information marked

proprietary and in the context of Mr. Simion's additional testimony, does not contradict Dr.

Simeon's statements that his reverse engineering was based on his own observations of the units,

not trade secrets of MDI.

Finally, Mr. Kierstead states that during his trips to MDI's facility in 2003 through 2006,

on fewer than five occasions and in response to a specific question, he viewed portions of schematics and/or drawings (no more than ten pages at a time) and at no time did he ever see the full set of schematics for the LVPS units (which he understands to exceed 100 pages), nor did he take notes or discuss the information with a third party. (*Kierstead Reply Decl.,* dated June 1, 2010, ¶ 5.) He explained that he was not trained as an electrical or power supply engineer nor experienced in the specific circuits needed to understand the schematics of such designs, and that in all of his conversations with Dr. Simion, the information he discussed was confined to visible information from the module unit delivered to Brookhaven. (*Id.* at ¶¶ 7, 12.) Mr. Eng states that he reviewed two to three pages of schematics on one occasion, February 14, 2006, took no notes, and did not provide information gleaned from that review to anyone at BNL or otherwise. (*Id.* at ¶ 4.)

In short, Plaintiff has failed to proffer evidence that Defendants improperly disclosed proprietary information gleaned from MDI's circuit schematics to Dr. Simeon that tainted Dr. Simeon's reverse engineering of the LVPS units. Having reverse engineered the power units owned by Brookhaven based on his own examinations of the power supplies and not with reference to MDI trade secrets or information gleaned from proprietary information, the record shows that Dr. Simeon's reverse engineering of the LVPS units was proper.

### (e)      Technical Drawings Created by Simeon

Plaintiff maintains that BSA disclosed Dr. Simeon's tainted technical schematics to defendant AEIS and others. Because the Simeon schematics were (i) independently developed based on LVPS units that were owned by Brookhaven under the parties' contracts and NDAs, and (ii) there is no evidence that Defendants improperly disclosed proprietary information or

41

information gleaned therefrom, BSA's disclosure of the schematics was not a violation of the NDA or a misappropriation of MDI's trade secrets.

### (f)    Three Written Disclosures

Plaintiff maintains that BSA disclosed proprietary information and trade secrets to Ensil in three written disclosures gleaned form MDI circuit schematics.  Specifically, MDI asserts that Brookhaven gave a block diagram of the power supply to Ensil, as well as components and component values, which tainted Ensil's reverse engineering.[18]  (*Esatto Decl.*, dated April 23, 2010, Ex. 49, ¶ 14.)  The Court disagrees.

As discussed previously, Brookhaven had full title to the LVPS units delivered by MDI to Brookhaven under Contracts 66116 and 91308, and therefore BSA's ownership in the units permitted Defendants to hire Ensil on December 1, 2006 to reverse engineer the failed LVPS units.  A review of the record fails to show any evidence that the materials given to Ensil were prepared using proprietary information gleaned from MDI schematics.  The block diagram given

---

[18]Paragraph 14 of Exhibit 49, Expert Report of Hucheng Chen, dated December 11, 2009, states:

> I understand that Ensil was provided with two LVPS units.  I am aware that Ensil was provided a block diagram a well as limited oral information about some of the issues BNL encountered with the LVPS units.  I am not aware of other documentation, *i.e.*, schematics or control boards, provided to Ensil.  I understand that BNL provided no MDI proprietary information to Ensil.  I understand that, in order to reverse engineer schematics and parts lists for the LVPS units, Ensil had to open the units to physically view the internal individual components, conduct tests on components inside the unit, and x-ray portions of the unit to identify the specific locations of components.  I understand that it was not difficult to open the LVPS units to physically observe the internal components as part of the reverse engineering.  I understand that while some components had markings identifying their respective source (*i.e.,* manufacturer and/or part number) or electrical ratings, some parts were unmarked and had no identifying information at all. In all those instances, I understand that Ensil identified those parts as ones commonly used for such purpose and function.

(*Id.*)

to Ensil was not an MDI document nor was it prepared from information gleaned from MDI

schematics.  Jon Sandberg, Chief Electrical Engineer in the Collider Accelerator Department at

BNL, stated that during a November 14, 2006 meeting with Ensil, he gave Ensil a copy of the

LVPS Basic Block Diagram created on October 30, 2006 by Wing Louie, an engineer at BNL.

(*Sandberg Reply Decl.*, dated June 3, 2010, ¶¶ 1, 3.)  According to Mr. Sandberg, the block

diagram was created solely by observations of the LVPS delivered to BNL and reference to Dr.

Simion's schematics, with no other materials given to Ensil to conduct the reverse engineering of

the power units.[19]  (*Id.* at ¶¶ 3-4.)  Likewise, Wing Louie, project engineer at BNL and creator of

the block diagram, stated that in preparing the LVPS Basic Block Diagram, he relied solely on the

LVPS units, schematics previously made by Dr. Simion, and discussions with Wahfun Eng about

general circuit theories, as well as his own understanding of circuits from past electronic

experience and publicly available articles, without reliance on any MDI documents labeled

proprietary or confidential or information gleaned therefrom or from any conversations with

anyone regarding proprietary information gleaned therefrom.  (*Louie Reply Decl.*, dated June 3,

2010, ¶¶ 1, 3-9.)  Given that the block diagram and underlying components were not trade secrets

of MDI, nor is there any evidence that engineers at BNL utilized information gleaned from MDI's

trade secrets or material labeled proprietary[20], Ensil's reverse engineering of the LVPS units to

---

[19]Inasmuch as there has been no record evidence that Dr. Simion's reverse engineering of
the power units owned by Brookhaven (and resulting schematics) was improper, MDI's argument
that Ensil misappropriated MDI's trade secrets and proprietary information gleaned from Ensil's
reference to Dr. Simeon's schematics is equally unavailing.

[20]Having examined the record, the Court finds no evidence to the contrary.  MDI's
speculation that because Ensil was given the block diagram listed in BNL Memorandum dated
November 27, 2006, (*Esatto Decl.*, dated April 23, 2010, Ex. 50), "[i]t is reasonable to conclude
that since the block diagram was in fact provided, that the remaining documents indicated in the

make a set of schematics and parts list was not improper.

Having found no evidence that BSA disclosed trade secrets or proprietary information gleaned from MDI schematics to either Dr. Simeon or Ensil or that the schematics and information created by Dr. Simeon and Ensil were tainted, Plaintiff's argument that BSA gave defendant AEIS and Algen proprietary and trade secret information by disclosing the Simeon and Ensil schematics is without merit.  Finally, MDI's assertion that BSA disclosed trade secrets to the public by issuing a public request for proposal for a replacement power system and posting certain materials on the CERN website likewise fails.  (*Esatto II Decl.*, dated May 21, 2010, Exs. 124, 126.)  Given the lack of evidence that the materials listed in the proposal or posted on the website were from MDI trade secrets or schematics and no evidence has been presented that BSA (and/or others acting on its behalf) gleaned proprietary information from the materials which was disclosed to the public, MDI has failed to demonstrate that BSA disclosed trade secrets to the public.

Because Plaintiff has failed to submit evidence to raise a genuine issue of material fact as to whether MDI possessed a trade secret that Defendants misappropriated, and the uncontroverted evidence demonstrates that there was no misappropriation of trade secrets as a matter of law, the Court grants Defendants' motion for summary judgment on this claim.

**B.      Breach of the Non Disclosure Agreements (Claim 2)**

In order to prevail on a claim for breach of contract under New York,[21] "a plaintiff must

---

Sandberg memo were disclosed to Ensil," (Pl.'s Mem. of Law in Opp., at 8-9), is insufficient to create a genuine issue of material fact.

[21]The non disclosure agreements state that they shall be governed by and interpreted in accordance with the laws of the State of New York.  (*Esatto Decl.*, dated April 23, 2011, Exs. 19,

44

prove by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages cause by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC,* 631 F.3d 42, 52 (2d Cir. 2011); *see Sit-Up Ltd. v. IAC/InterActive Corp*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *14 (S.D.N.Y. Feb. 20, 2008) (applying same to breach of non-disclosure agreement).

Plaintiff avers that defendant BSA breached the March 2004 NDA when it disclosed the production control board schematics to Dr. Simeon and defendant AEIS. For the reasons discussed above, MDI is unable to demonstrate that BSA disclosed any trade secrets to Dr. Simeon, defendant AEIS or any other third parties in contravention of the NDAs. Accordingly, Defendant BSA's motion for summary judgment based on Plaintiff's claim for breach of the NDAs is granted and Plaintiff's cross-motion for partial summary judgment on its claim for breach of the March 2004 non-disclosure agreement is denied.

## C. Tortious Interference with Contractual Relations (Claim 3)

To state a claim for tortious interference with contract under New York law, a plaintiff must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification[22]; (4) actual breach of the contract; and (5)

_____

21.)

[22]In deciding whether the intentional procurement was "without justification," courts consider the following factors:

> the nature of the conduct of the person who interferes, the interest of the party being interfered with, the relationship between the parties, the motive and

damages resulting therefrom." *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401-02 (2d Cir.

2006) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)); *see Harris*

*v. Queens County Dist. Attorney's Office,* No. 08-CV-1703 (CBA) (LB), 2009 WL 3805457, at

*11 (E.D.N.Y. Nov. 9, 2009).  "The third element [of a tortious interference with contractual

relations claim] involves a defendants' improper intentional interference with [] performance of

an existing contract." *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 813 (S.D.N.Y.

2008) (internal quotation marks and citations omitted).  That is to say, "a plaintiff alleging a

tortious interference with contractual relations claim must allege that the defendant used wrongful

means to procure the third party's breach."  (*Id.*) (internal quotation marks and citations omitted).

The New York Court of Appeals defines "wrongful means" to include "physical violence, fraud,

or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic

pressure." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980).

However, "wrongful means" does not include persuasion alone even if such persuasion is

"knowingly directed at interference with the contract." *Id.*

      Plaintiff claims that defendant AEIS tortiously interfered with MDI's contract with Payton

when Payton disclosed MDI's proprietary technical information and trade secrets regarding the

development of transformers for use in the LVPS units to defendant AEIS.  Defendant AEIS

---

interests sought to be advanced by the one who interferes, the social interests in
protecting the freedom of action of that person, the contractual interests of the
party interfered with, and the proximity or remoteness to the interference of the
conduct complained of.

*Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC,* No. 07-CV-7998, 2008 WL
1710910, at *4 (S.D.N.Y. Apr. 10, 2008).

disagrees, asserting principally that contrary to Plaintiff's claim there was no tortious interference

with the contract because Payton did not disclose MDI confidential information and trade secrets

to Defendants.  A review of the record shows the following.

Beginning during Contract 44125 and continuing under Contracts 66116 and 91308,

Payton designed and/or manufactured transformers for MDI.  (*Sacks Decl.,* dated April 23, 2010,

Exs. 40-50.)  After AEIS was retained by BNL to conduct a failure analysis of the power supplies,

AEIS sent Payton an e-mail dated January 25, 2007 requesting information regarding three planar

transformers used by MDI in the LVPS units delivered to BSA.  (*Id.* at 52.)  The following day,

Jim Marinos, Executive VP of Payton replied:

> [t]he three planar transformers are 'MDI Proprietary' and information concerning
> those magnetic devices are protected by MDI's non disclosure agreement.  All
> inquiries concerning those planar transformers should be directed to MDI directly.

(*Id.*)  At his deposition, Mr. Marino testified that he did not disclose any MDI proprietary

information to AEIS.  (*Id.,* Ex. 98 at 140, 163.)  The evidence MDI proffers for the assertion that

"Mr. Marinos specifically testified that the information provided to Payton by MDI was

'confidential and proprietary information' used to 'custom design' the transformers" is not borne

out by the record.  At his deposition, Mr. Marinos testified as follows:

Q:   Mr. Marinos, earlier today you testified that the operating frequency of 250
     kilometers was supplied to you by MDI, correct?

A:   Correct.

Q:   Also earlier today you testified that information that is supplied to you by a
     customer, such as MDI, is confidential and proprietary of the customer?

A:   That's correct.

Q:   Also today you earlier today testified that the type of core material, the R type of

core material was selected based upon the design information that you received from MDI being the functional specification and mechanical parameters for the transformer, correct?

A:      Correct.

Q:      And you also testified earlier today that the design information you used in connection with the custom design for MDI was confidential and proprietary to MDI?

A:      Correct.

Q:      And therefore the type of core material would be also confidential and proprietary to MDI?  That was used?

A:      Correct.

Q:      Further, earlier today you testified that the number of turns and turns ratio that was used for the custom transformers that were designed by Payton for MDI was directly based upon information that was delivered to you by MDI and calculated from those parameters?

A:      Correct.

Q:      The turns ratio and turns were used in connection with the design of the custom transformer, correct?

A:      Correct.

Q:      Therefore the turns ratio and number of turns you consider that to be confidential proprietary to MDI?

A:      Correct.

Q:      The flux density and the maximum flux as well as the peak max flux density for seconds, that was calculated based on information given to you by MDI, correct?

A:      Correct.

Q:      The volt-seconds flux density and maximum flux density was used in connection with the design of the custom part for MDI, correct?

A:      Correct.

Q:     Therefore that information would also be confidential and proprietary information of MDI?

A:     Yes.
        MR. WEINFELD:    Nothing further.
        MR. WATSON:     Done?
        MR. WEINFELD:    Yes.
                       CROSS EXAMINATION BY MR. WATSON

Q:     . . . . Were any; designs or drawings furnished by MDI provided to AEI[S]?

A:     No.

Q:     Were any designs or drawings furnished by MDI furnished to Brookhaven?

A:     No.
     . . . . MR. WEINFELD:    One second.  When you ask him the question do you mean by him or by Payton?
        MR. WATSON:     Payton

Q:     Your response to my question was that no designs or drawings furnished by MDI was produced or disclosed to AEI[S] or Brookhaven by Payton, correct?

A:     Correct.

(*Esatto II Decl.*, dated May 21, 2010, Ex. 108 at 159-63.)  Thus, Mr. Marinos' deposition testimony is not inconsistent.

Defendant AEIS has presented evidence that Payton disclosed information to AEIS about generic information based on commercial transformers.  That being said, however, upon a review of the parties' submissions, there is one document that does raise a disputed fact concerning whether Payton disclosed proprietary information to AEIS and/or Brookhaven.  An exhibit entitled "LVPS Status Update" dated January 31, 2007 and authored by Francesco Lanni (Deputy Group Leader for the Omega Group of BNL) states on its face in pertinent part:

•     Payton "leaked" to AE[IS] partial information on the power transformers

- · . . . before the usual answer:
  - *Hi Steve. The three planar transformers are "?? Proprietary" and information concerning these magnetic devises are protected by ??? a non disclosure agreement. All inquiries concerning those planar transformers should be directed to ??? directly.*

- · 11V transformers are running on 2 turns at -5.5V/turn. Seems like the transformer specs is 300V-uSec for 16 turns in unipolar application. It implies 3.3V/turn @ 180kHz and 4.2V/turn at 225kHz
  - 100% over-rated. Completely saturated

- · It explains why thermal measurements were giving us >100C. Initially was erroneously attributed to a "hot" (200C) pre-load resistor glued on the L7 of the top board.

(*Id.* at 110 at B0156469.) Although based on the record a close question exists as to whether wrongful means were used to induce Payton to "partially leak" proprietary information to AEIS in breach of Payton's confidentiality agreement with MDI, when considered with record evidence that BSA and AEIS thereafter ordered transformers from Payton,[23] the Court finds on balance, an inference can be made that there may have been a degree of "economic pressure" involved. Thus, a genuine issue of material fact exists as to whether or not there was an intentional procurement of the Payton's breach of the contract without justification.

Accordingly, the Court denies defendant AEIS's motion for summary judgment on Plaintiff's claim for tortious interference with MDI's contract with Payton.

**D.     Unjust Enrichment (Claim 4)**

"In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."

---

[23]Defendants maintain the Payton units were not the same as the MDI transformers. (*Sacks Decl.,* dated April 23, 2010, Exs. 53-56, 59, 98, 99; Defs. 56.1 Stmt. ¶ 48.)

*Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (internal

quotation marks and citations omitted).

   As previously discussed, having found a genuine issue of material fact exists as to whether

defendant AEIS obtained MDI's trade secrets and proprietary information through improper

means, viz. Payton's alleged leak of partial information about the power transformers, when

considered with record evidence that BSA and AEIS thereafter ordered transformers from Payton

and not MDI, material issues of fact exist as to whether the alleged partial disclosure benefitted

defendant AEIS at MDI's expense.  Accordingly, the Court denies defendant AEIS's motion for

summary judgment on Plaintiff's claim for unjust enrichment.

   **E.   Trademark Infringement under the Lanham Act and**
   **Related Common Law Claim of Unfair Competition (Claims 5 and 6)**

   Plaintiff asserts that it is entitled to summary judgment on its unfair competition and false

designation of origin and trademark infringement claims for defendant BSA's continued use of the

MDI logo on the retrofitted LVPS units shipped to CERN for installation in the ATLAS Detector.

According to MDI, the extensive nature of the changes made to its LVPS units by Algen in the

retrofit fundamentally altered the specification upon which the original MDI design was based and

consequently BSA's use of the mark calls into question the quality of a product bearing MDI's

logo.  Defendant BSA in turn contends that summary judgment should be granted in its favor

because MDI has failed to present evidence to create an issue of fact in support of its allegations.

   Under Section 43(a) of the Lanham Act, "a producer of a product or service may initiate a

cause of action against a person who uses 'any word, term, name, symbol, or device, or any

combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or

51

approval of [the producer's] . . . services." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 153-54 (2d

Cir. 2007) (citing 15 U.S.C. § 1125(a)(1)(A)); *see also Dastar Corp. v. Twentieth Century Fox*

*Film Corp.,* 539 U.S. 23, 32 (2003) ("Section 43(a) of the Lanham act prohibits actions like

trademark infringement that deceive consumers and impair a producer's goodwill.").  To prevail on

a claim of trademark infringement under the Lanham Act, MDI must establish: "(1) that the mark

(the MDI logo) is distinctive as to the source of the good, and (2) that there is a likelihood of

confusion between its good and the defendant's." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101,

115 (2d Cir. 2001).   The New York common law claims are analyzed in tandem with the federal

claims.  "It is well-established that the elements necessary to prevail on causes of action for

trademark infringement and unfair competition under New York common law mirror the Lanham

Act claims." *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y.

2005) (internal quotation marks and citation omitted); *see also Louis Vuitton Malletier v. Dooney*

*& Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006).  "New York unfair competition law also requires

a showing of actual confusion and bad faith before monetary relief may be awarded." *Nabisco v.*

*Warner-Lambert Co.,* 32 F. Supp. 2d 690, 701 (S.D.N.Y. 1999).

### 1.        Distinctiveness

Although it is clearly established that Section 43(a) of the Lanham act protects unregistered

trademarks, *see Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992), where as here,

the mark is unregistered "the burden is on the plaintiff to prove the mark is . . . valid," *Courtenay*

*Comm. Corp. v. Hallmark, Inc.,* 334 F.3d 210, 217 (2d Cir. 2003).  In order to be valid, "a mark

must be capable of distinguishing the applicant's goods from those of others." *Two Pesos, Inc.*,

505 U.S. at 768.  A mark is "distinctive and capable of being protected if it either (1) is inherently

distinctive or (2) has acquired distinctiveness through secondary meaning." *Id.* at 769 (emphasis omitted); *see also Yurman Design,* 262 F.3d at 115. "In contrast, generic marks . . . are not registrable as trademarks." *Id.* at 768. "Essentially, a mark is generic if, in the mind of the purchasing public it does not distinguish products on the basis of source but rather refers to the type of product." *Courtenay Comm.*, 334 F.3d at 214 n.2.

In the instant matter, because the MDI logo is unregistered, Plaintiff has the burden of proving that it is distinctive. In order to meet this burden, MDI relies on literature showing MDI's use of the MDI acronym brand, the fact that its mark, the MDI logo, is an acronym which stands for the name of Plaintiff, Modular Devices, Inc., and the fact that it is comprised of highly stylized lettering and design. (*Esatto Decl.*, dated April 23, 2010, Ex. 70.) Defendant BSA, however, has provided evidence that the MDI logo is not inherently distinctive because although MDI has used such an acronym and logo, many others in MDI's field has as well, including a third party listed as the owner of a trademark registration (U.S. Reg. No. 1,086,282) for "MDI" – Modular Devices, Inc. of Torrance, CA.[24] (*Sacks Decl.,* dated April 23, 2010, Exs. 110, 111.)

The record is devoid of any evidence regarding how the purchasing public views the mark or of whether the mark has acquired secondary meaning. Apart from the examples of the MDI logo itself, Plaintiff has presented no other evidence of distinctiveness. Hence, without proffering such evidence, Plaintiff cannot meet its burden of showing it is entitled to summary judgment on these claims. Nevertheless, the Court does find Plaintiff has presented sufficient evidence

---

[24]By letter dated September 2, 2010, Plaintiff informed the Court about the recent cancellation of the third party trademark registration, Registration No. 1,086,282. *(Esatto Letter*, dated September 2, 2010.) In view of the fact that the trademark registration was in effect from February 1978 through August 2010, the recent cancellation has minimal bearing on the within motion.

regarding the MDI logo itself, consisting of the highly stylized letters M, D, and I all set within a square containing multiple internal components linked in a specific modular design, to survive Defendant BSA's motion for summary judgment on these claims. *See, e.g., Courtenay v. Hall,* No. 01 Civ. 2228 (LLM), 2007 WL 2089359, at *4 (S.D.N.Y. July 20, 2007) (plaintiff's mark "which consists of black type of the words *iMarketing News* in a particular font superimposed on red and yellow colors, linked in a specific design, is sufficient to survive [d]efendants' cross-motion for summary judgment on the first prong of the Section 43(a) analysis. Such features are sufficiently unique that a finder of fact could determine them to be 'inherently distinctive' and thus entitled to Lanham Act protection"). Thus, as to the first prong of the Lanham Act analysis, a finder of fact could determine the features of the logo sufficiently unique to be "inherently distinctive" and therefore entitled to trademark protection.

### 2.     Likelihood of Consumer Confusion

Under the second prong of the Lanham Act analysis, MDI must show that there exists "a likelihood of confusion between its good and the defendant's." *Yurman Design,* 262 F.3d at 115. A likelihood of confusion is not limited to situations where "consumers would believe that the defendant's goods or services are from the same source as those of the plaintiff. *Sports Auth. Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 960 (2d Cir. 1996). Rather, "a defendant may also be liable under the Lanham Act where the defendant's actions are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the defendant's goods or services with those of the plaintiff." *Id.* (internal quotation marks and citation omitted). *See Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005). When considering the issue of whether there is likelihood of confusion, courts in the Second Circuit are

guided by the eight factors set forth in *Polaroid Corp. v. Polarad Elects. Corp.*, 287 F.2d 492, 495

(2d Cir. 1961).   *See Natural Organics, Inc.*, 426 F.3d at 578.  The *Polaroid* factors are as follows:

(1) strength of the plaintiff's mark; (2) similarity of the parties' marks; (3) proximity of the parties'

products in the marketplace; (4) likelihood that the plaintiff will bridge the gap between the

products (enter a market related to that in which the defendant sells its product); (5) evidence of

actual confusion between the two marks; (6) the defendant's bad faith (intent in adopting the

mark); (7) quality of the defendant's product; and (8) sophistication of the relevant consumer

group.  *Polaroid*, 287 F.2d at 495.  Under the *Polaroid* test,[25] the Court is unable to conclude that

the "undisputed evidence would lead only to one conclusion."  *Sports Auth. Inc.,* 89 F.3d at 960.

Where, as here, there is evidence concerning whether a potential consumer would be able to

observe the MDI logo, a genuine issue of material fact exists as to whether there is a likelihood of

confusion from the continued use of the MDI logo on the retrofitted power supplies.  *Cf. Lois

Sportswear U.S.A., Inc. v. Levi Straus & Co.,* 799 F.2d 867, 871-73 (2d Cir. 1986) (finding that for

post-sale confusion, potential customers must be able to observe the logo).

The record shows that Algen retrofitted the MDI LVPS units which were then installed in

the Atlas Detector in CERN.  In May 2009, the last of the retrofitted units were installed in the

ATLAS Detector and after the installation, no one had access to the retrofitted units.  To

demonstrate the likelihood of confusion, Plaintiff has proffered evidence that (i) the retrofitted

LVPS at CERN constitute new products that continue to bear the MDI logo, (ii) the retrofitted

power units were shipped to CERN and during the installation process the MDI logo was visible,

---

[25]Because in the instant matter, the likelihood of confusion is based on defendant BSA's
actual use of Plaintiff's mark on the retrofitted power units by virtue of BSA's failure to remove
the logo, only certain of the *Polaroid* factors are relevant.

(iii) when the power supplies become accessible the MDI logo is plainly visible, and (iv) prospective purchasers have referred to the retrofitted power supplies in use at CERN as "the MDI Supplies." (*Esatto Decl.*, dated April 23, 2010, Exs. 49, 60, 71-72.)  On the other hand, BSA has presented evidence that raises a genuine issue of material fact as to whether there is in fact a likelihood of confusion from the continued use of the MDI logo on the retrofitted power supplies. According to Francesco Lanni, Deputy Group Leader for the Omega Group of BNL, the ATLAS Detector is anticipated to be closed until the end of 2011,[26] during which time it will be impossible for anyone to have access to the retrofitted units installed in the detector or to otherwise view them. (*Lanni Decl.*, dated March 26, 2010, ¶ 11-12.)  In addition, as to the visibility of the logo during the installation of the units at CERN, Mr. Lanni stated that he was present when the CERN employees, who are involved in the decisions concerning the selection of purchase of parts for the ATLAS Detector, including the MDI LVPS units, were informed that the MDI LVPS units which were currently installed in the Detector had been retrofitted.  (*Id.*; *Lanni Decl.*, dated May 7, 2010, ¶ 24; *Lanni Reply Decl.*, dated May 27, 2010, ¶ 2.)

In sum, the parties have not met their respective burdens of showing that they are entitled to summary judgment on Plaintiff's unfair competition and false designation of origin and trademark infringement claims.  Accordingly, Defendant BSA's motion for summary judgment on these claims is denied, and Plaintiff's cross motion for summary judgment on these claims is denied.

## IV.    Plaintiff's Cross Motion to Strike BSA's Eighth Affirmative Defense

---

[26]Although speculation, BSA proffered evidence that when access to the Detector occurs, the MDI retrofitted units will be removed and replaced by completely new LVPS units, which are designed to operate for the remaining lifetime of the ATLAS experiment and will not bear any MDI identification.  (*Lanni Decl.*, dated March 26, 2010, ¶ 14.)

In response to MDI's Complaint, defendant BSA asserted as an affirmative defense that "BSA had the right to use the information it received from Plaintiff and to full and complete ownership of the products it received from Plaintiff."  (Defendant BSA Answer and Counterclaim, Eighth Affirmative Defense.)   Having previously granted Defendant's motion for summary judgment on Claims 1 (Misappropriation of Trade Secrets) and Claim 2 (Breach of the Non Disclosure Agreements), Plaintiff's motion to strike the Eighth Affirmative Defense is denied as moot.

## V.     Plaintiff's Motion for Summary Judgment on BSA's Counter Claim for Breach of Contract

In this action BSA asserts a counterclaim for breach of contract based on MDI's failure to deliver functioning power supplies, MDI's failure to perform (or properly perform) the failure analysis required under the contracts, and MDI's failure to deliver intellectual property to Brookhaven to conduct its own failure analysis on the power supplies.  Plaintiff moves for summary judgment on defendant BSA's counterclaim for breach of contract on the grounds that (1) BSA did not provide MDI with timely notice under Section 2-607 of the New York Uniform Commercial Code ("U.C.C." or the "Code") and therefore failed to preserve a breach of contract claim; and (2) BSA did not itself incur any of the costs that form the factual bases of its damages calculation.  In the alternative, Plaintiff seeks partial summary judgment on BSA claim's for damages with respect to its replacement expenditures.

As discussed previously, the contracts between MDI and BSA relating to the production of the LVPS units are governed by the federal common law of government contracts.  In interpreting the contracts, the Court may look to state law.  *American Home Assur. Co.*, 446 F.3d at 316.  In

order to prevail on a claim for a breach of contract claim, a plaintiff must demonstrate (1) the existence of a contract, (2) performance by the claimant, (3) the failure to perform by the breaching party, and (4) resultant damages. *Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Finance Corp.*, 567 F. Supp. 2d 579, 592 (S.D.N.Y. 2008).  Plaintiff avers that BSA failed to preserve its claim for breach of contract because BSA did not provide notice of the breach until at least 14 months after BSA's acceptance of the LVPS units as required under U.C.C. § 2-607.

Although under New York law, Article 2 of the U.C.C. governs a contract for the sale of goods, it is unclear the extent to which the UCC is binding on government contracts. *See United States v. Wegematic Corp.,* 360 F.2d 674, 676 (2d Cir. 1966) (looking to the provisions of the U.C.C. for guidance as a source for fashioning Federal common law); *Banque de Paris et des Pays-Bas v. Amoco Oil Co.*, 573 F. Supp. 1464, 1469 (S.D.N.Y. 1983) (same); *but see Technical Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1372 (Fed. Cir. 1998) (looking to the UCC for guidance, but concluding that "the Uniform Commercial Code is not binding with respect to government contracts"); *GAF Corp. v. United States*, 932 F.2d 947, 951 (Fed. Cir. 1991) ("Congress has not applied the Uniform Commercial Code to federal contracts").  The Court will look to the U.C.C. for guidance in its review of the parties' contracts but will not override any of the specific contract provisions where there may be a conflict with the Code. *Cf. Appeal of Catalytic Engineering and Mfg. Corp.*, 1972 WL 20918 (A.S.B.C.A.), at *46, 72-1 BCA P 9342, 9342 (A.S.B.C.A. Feb. 28, 1972) (looking to the Code for guidance but holding that where the contract language is clear the Code does not override specific contract provisions).

The record evidence shows that BSA contracted with MDI to provide two first articles and sixty eight LVPS production units, fifty-eight of which were to be installed as a set in the ATLAS

Detector.  Commencing in March 2005, MDI began delivering the LVPS units.  By June 21, 2005, BSA identified five production units which had problems and requested from MDI return material authorizations ("RMA") to permit these units to be handled in accordance with MDI's Standard Warranty terms.  Between June and August 2005, the production units continued to fail and BSA requested and received RMA's from MDI. As a result, on December 17, 2005, BSA and MDI discussed a retrofit program to address the failures, which MDI commenced in January 2006. There continued to be failures in some of the units delivered under the retrofit program, and there is evidence the parties attempted to address the problems with the MDI retrofitted LVPS but when the units continued to fail, BSA requested a failure analysis from MDI as well as sought copies of technical documents to enable BSA to conduct its own failure analysis of the power supplies. When the parties were unable to resolve their differences in addressing the recurring failures of the units, BSA developed a backup plan which included hiring third parties to conduct independent failure analysis and to repair the modules in order to meet an August 2007 deadline for their installation at CERN.  (*Sacks Decl.,* dated April 23, 2010, Exs. 131-156.)  On January 3, 2007, BSA demanded that all LVPS units under the contract in MDI's possession be delivered by January 19, 2007.  BSA made the final payment for the power supplies on March 7, 2007.

MDI has presented evidence demonstrating that BSA did not provide notice of the alleged breach until a settlement conference in March 2008 when BSA first notified MDI that it believes MDI to be in breach of its contractual obligations for its failure to deliver working power supplies. (Striegel Decl., dated April 23, 2010,  ¶¶ 15-16.)  In response to MDI's submissions BSA has proffered evidence raising triable issues of fact, with respect to its timely notification of the recurring failures of the units and the need to independently identify and/or address the failures to

meet its deadline, by way of the following communications between the parties: (i) on August 11, 2006, Brookhaven invoked a provision under Contract 91308 to request a failure analysis of all units, referring to "the failures in the modules and/or components; (ii) on October 10, 2006, Brookhaven told MDI that "as a result of recurring failures" it requires intellectual property from MDI to conduct an independent failure analysis, and that failure to deliver will be a breach; (iii) on October 11, 2006, Brookhaven told MDI of "recurring failures" of the power supplies at CERN, and coupled with an unknown cause of the failures, creating an urgent need to conduct an independent failure analysis in order to meet an August 2007 deadline; (iv) on October 12, 2006, Brookhaven told MDI that it needs to make an independent root cause failure analysis determination of the "faulty power supplies"; (v) on October 25, 2006, Brookhaven told MDI that "there have been failures in the supplies that have not yet been reported"; (vi) on November 14, 2006, Brookhaven met with MDI, told MDI that three of four retrofits last delivered failed, and gave MDI a report indicating that current feedback was not functioning properly; and (viii) on November 29, 2006, Brookhaven told MDI that it intended to reverse engineer the power supplies "to determine the failure of the power supplies that have been provided under the contract." (*Id*.)

Under the Code, acceptance of non-conforming goods with knowledge of their nonconformity does not preclude "any other remedy . . . for non-conformity."  N.Y.U.C.C. § 2-607(2); *see Cliffstar Corp. v. Elmar Indus., Inc.,* 678 N.Y.S.2d 222, 223 (4th Dep't 1998); *see also Amerol Corp. v. American Chemie-Pharma, Inc.,* No. CV 04-0940 (JO), 2006 WL 721319, at *7 (E.D.N.Y. Mar. 17, 2006) ("The provisions governing acceptance, rejection, and revocation define the buyer's obligation to pay for goods.  However they do not define the limits of the buyer's right to seek relief for damages caused by a seller's delivery of defective goods."); *Xuchang Rihetai*

*Human Hair Goods Co. v. Hanyu Int'l USA Inc.*, 2001 WL 883646, at *4 (S.D.N.Y. Aug. 7, 2001).

To preserve such a claim for damages, "the buyer must within a reasonable time after he discovers

or should have discovered any breach notify the seller of breach or be barred from any remedy."

N.Y.U.C.C. § 2-607(3)(a); *see Xuchang*, 2001 WL 883646, at *4.  "Timely notification pursuant to

section 2-2607(3)(a) is governed by the standard of reasonableness."  *Walck Bros. Ag. Serv. v.*

*Hillock,* 774 N.Y.S.2d 218, 219 (4th Dep't 2004) (internal quotation marks and citation omitted);

*see Levin v. Gallery 63 Antiques Corp.*, No. 04 CV 1504 KMK, 2006 WL 2802008, at * 19

(S.D.N.Y. Sept. 28, 2006) "Under New York law, what constitutes a reasonable time is a factual

determination and depends on the nature, purpose and circumstances of the particular case."  *Levin,*

2006 WL 2802008, at * 19; *see CLC/CFI Liquidating Trust v. Bloomingdales, Inc.,* 851 N.Y.S.2d

68 (N.Y. Sup. 2007) (same).  Further, "notification is sufficient if it alerts [the seller] that the

transaction [was] troublesome but need not include a claim for damages or threat of future

litigation."  *Xuchang*, 2001 WL 883646, at *4 (quoting *Cliffstar Corp.,* 678 N.Y.S.2d at 223)

(internal quotation marks omitted)); *see Amerol Corp.,* 2006 WL 721319, at *7 (same).  Viewed

under these standards, BSA's repeated complaints of recurring failures in the power supplies and

requests for failure analysis and intellectual property to allow Brookhaven to identify the root cause

of the failures raise a genuine issue of material fact as to whether BSA notified MDI of the alleged

breach in a reasonable time.  *See Ardex Cosmetics v. Logotech, Inc.,* 2002 WL 169393, at *5

(N.D.N.Y. Jan. 22, 2002) ("repeated complaints made within a reasonable time upon the receipt of

the [goods] is sufficient to recover damages"); *Cliffstar Corp.,* 678 N.Y.S.2d at 223 (same);

*Murray Hill Apparel, Inc. v. Yunsa*, 856 NY.S.2d 499 (N.Y. City Civ. Ct. 2008) ("complaints and

service are sufficient to preserve a buyer's right to sue")

Moreover, viewed under the provisions of the contract between the parties, the fact that BSA accepted and paid for and used the units during 2006 and early 2007 to determine the root cause of the failures and to repair the units did not waive any of BSA's rights and remedies under the contract with respect to the power supplies.  Under the contracts between the parties, Article 10 of Attachment A provided that:

> Brookhaven's acceptance of the goods or services delivered hereunder and its subsequent use thereof shall not constitute a waiver of any improper materials or workmanship, or Brookhaven's rights and remedies with respect to them Brookhaven's acceptance and its subsequent use of goods or services delivered after the agreed upon delivery date shall not constitute a waiver by Brookhaven of any rights arising from said late delivery.

(*Sacks Decl.,* dated April 23, 2010, Ex. 17, Ex. A.)   Finally, a review of the submissions of both parties raise triable issues of fact as to whether the LVPS units delivered were nonconforming and/or defective, and if so, whether such nonconformity and/or defect was the cause of BSA's damages, including damages related to BSA's replacement expenditures.  *See Cliffstar Corp.,* 678 N.Y.S.2d at 223; *see also EIFS, Inc. v. Morie Co.,* 750 N.Y.S.2d 86, 87 (2d Dep't 2002).

In short, genuine issues of material fact preclude the grant of summary judgment in Plaintiff's favor on its motions for summary judgment and partial summary judgment on defendant BSA's counterclaim for breach of contract.  Accordingly,  Plaintiff's motions are denied.

## CONCLUSION

For all of the foregoing reasons: (1) Plaintiff's motion to strike the reply declaration of Ira S. Sacks is denied; (2) Defendants' summary judgment motion on Plaintiff's First Cause of Action is granted; (3) Defendant BSA's summary judgment motion on Plaintiff's Second Cause of Action is granted and Plaintiff's cross-motion on that claim is denied; (3) Defendant AEIS's summary

judgment motion on Plaintiff's Third and Fourth Causes of Action is denied; (4) Defendant BSA's summary judgment motion on Plaintiff's Fifth and Sixth Causes of Action is denied and Plaintiff's cross-motion on those claims is denied; (5) Plaintiff's motion to strike the Defendants' Eighth Affirmative Defense is denied; and (6) Plaintiff's cross-motion for summary judgment on Defendant BSA's Counterclaim is denied.

Dated: Central Islip, New York
      March 31, 2011

**SO ORDERED:**

_____/s/_____

ARLENE ROSARIO LINDSAY
United States Magistrate Judge